[No. S004467, Crim. No. 22810. June 23, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
FERNANDO BELMONTES, Defendant and Appellant.

758

**COUNSEL**

Eric S. Multhaup, under appointment by the Supreme Court, Jean R. Sternberg and Kathy M. Chavez for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Edmund D. McMurray, Robert D. Marshall, Jane N.

Kirkland, Michael T. Garcia and Jane L. Lamborn, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**EAGLESON, J.**—Defendant Fernando Belmontes was convicted of the first degree murder of Steacy McConnell (Pen. Code, § 187)[1] and burglary in the second degree. (§§ 459-460.) The jury returned special findings that he personally committed the killing, and that the murder was intentional, wilful, deliberate, premeditated, and the result of the commission or attempted commission of the burglary. A special circumstance allegation under the 1978 death penalty law was found true: that the murder was committed while defendant was engaged in the commission or attempted commission of a burglary. (§ 190.2, subd. (a)(17)(vii).) The jury made additional special findings that defendant was the actual killer and had acted with specific intent to kill. The jury fixed the penalty at death; this appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

For the reasons set forth hereafter, we affirm the judgment in its entirety.

### I. GUILT PHASE

### A. FACTS

*Prosecution Case*

On Sunday, March 15, 1981, the parents of 19-year-old Steacy McConnell found her beaten unconscious on the floor of her residence in Victor, several feet from the unlocked front door. She had telephoned them that same morning to advise that several people, including Domingo Vasquez, had been threatening her.

McConnell died a short while later from cerebral hemorrhaging due to 15 to 20 gaping wounds to her head which cracked her skull. The pathologist testified there would have been sounds "like a cracked pot" associated with the blows which fractured the skull, and blood would have splattered in a manner consistent with the blood patterns found on the door jambs next to where she was found. A single contusion on McConnell's right temple was caused by blunt trauma of lesser force and did not lacerate the skin. It alone would not have caused death and—if it had been the first blow—would not

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

likely have caused unconsciousness. Numerous defensive bruises and contusions on her arms, hands, legs and feet evidenced a struggle. All wounds were consistent with having been made by the metal dumbbell bar in evidence at trial. McConnell's stereo components were missing. The lock on the rear bedroom door was broken in. The master bedroom was ransacked; traces of blood were found splattered on the walls, door jambs and a chest of drawers in that room.

Defendant was spending the weekend with Bobby Bolanos in Lodi.[2] Both knew Domingo Vasquez, who was acquainted with McConnell. During the week preceding the murder, Vasquez, Bolanos and others had "partied" at McConnell's house. Vasquez "ripped off" a quantity of amphetamine pills from her; the party ended with McConnell throwing Vasquez and his friends out of her house two days prior to the murder. The group subsequently discussed their general dislike of McConnell.

Bolanos, who pled guilty to burglary and received immunity from prosecution for the murder, testified for the People. On Sunday morning, he and defendant drove to Vasquez's residence in Bolanos's vintage black Chevy. Vasquez, who was talking on the telephone with McConnell when they arrived, shortly hung up and informed them that McConnell's parents were picking her up and she would not be home that day. Defendant was short of funds, having unsuccessfully tried to pawn a ring the previous week. Bolanos, a seasonal farmworker, was out of work. Vasquez was unemployed. The three men agreed to burglarize McConnell's residence, steal her stereo and "clean house." Defendant was wearing a baseball cap with its bill flipped up, Vasquez wore a stocking cap or beanie, Bolanos wore a checkered Pendleton shirt-jacket. Vasquez's girlfriend, Carrie Lynn Rogers, was present; she testified that as the men departed defendant picked up a steel dumbbell bar which he carried out with him.

Bolanos was the "wheel man" and never entered McConnell's residence; a role confirmed by defendant. En route to Victor, defendant suggested that he alone would approach the house on foot, using the metal bar if needed to force entry. Bolanos pulled over a short distance from the house; defendant left his wristwatch behind, concealed the bar under his jacket and walked to the residence. In accord with the plan, Bolanos and Vasquez waited several minutes, then drove up and backed into McConnell's driveway. Vasquez could not find the key to the trunk. As Bolanos got out of the vehicle to assist Vasquez, he heard repeated knocking or banging noises coming from within the house. They thought defendant was having trouble with the

[2] On the date of the crime, defendant was on parole from the California Youth Authority and living in a halfway house in Stockton. The jury was not told of this fact at the guilt phase.

stereo. Vasquez entered to assist him. Bolanos remained in the car, still hearing the rhythmic thumping sounds as Vasquez walked up to the front door.

Shortly, defendant and Vasquez emerged from the house carrying stereo components. Defendant alone was covered with blood sprinkled on his face, pants and shoes. Vasquez "looked like he had seen a ghost." Defendant informed Bolanos he had to "take out a witness" because she was home. He explained that McConnell heard Vasquez and Bolanos drive up, and that he hit her with the bar when she looked away from him, and continued to hit her approximately 15 more times.

Lucy Flores, McConnell's neighbor, observed a black Chevy with distinctive, wide taillights back into McConnell's driveway on the morning of her murder. A dark-complected man wearing a stocking cap got out of the passenger side and tried to unlock the trunk. He appeared to have difficulty with the lock, whereupon the driver, a male of Mexican or Italian ancestry, wearing a brown checkered shirt-jacket, got out of the car and unlocked the trunk. The driver got back in; the passenger walked towards the front of McConnell's house and met a third man. Flores did not see where the third man had come from. A short while later, she observed the two men hurriedly exiting from the back door of McConnell's house. The man in the stocking cap was carrying stereo speakers, the third man followed close behind carrying a stereo amplifier. They put the items in the trunk, got in the car and drove off.

Bolanos testified that en route to the nearby city of Galt to fence the stereo, defendant, who was wearing gloves, wiped blood off of the metal bar and his shoes. Defendant threw the bar out of the car window as they crossed a bridge over the Mokelumne river (Bolanos later led police to the location on the river bank from which the bar was recovered). The group went to the home of Manuel Vasquez, Domingo's brother, where defendant changed into a pair of clean pants. One Raul Barron was contacted; he met the three men at the home of Irma Vasquez, Domingo's sister, and purchased McConnell's stereo components for $100. The stereo components were recovered and introduced into evidence; Barron testified he paid $100 for them to the man wearing the baseball cap who did most of the talking.

Later that afternoon Bolanos gave his girlfriend, Teresa Cobarrubio, $15 from his share of the proceeds from the sale of the stereo. Acting scared, he informed her that he, defendant and Vasquez had burglarized McConnell's residence. The following day Bolanos and Cobarrubio read a newspaper account of McConnell's murder. Cobarrubio testified that at that point Bolanos related further details of the crime, informing her that he had

remained in his car outside of McConnell's house, and that defendant had exited from the house with blood all over his clothes, stating he had to "take a witness out."

On Monday, March 16, Vasquez called Bolanos in a panic to advise he had been questioned by police and did not want to "take the rap" for defendant. Bolanos and defendant went to Vasquez's house where the three sat in the living room discussing the murder. Carrie Lynn Rogers, Vasquez's girlfriend (who subsequently married him in jail—and who was a distant cousin to Bolanos) testified that from the kitchen she overheard the men discussing their sortie to McConnell's house, and heard defendant describe how he had first entered alone and hit McConnell several times with the bar, after which Vasquez had joined him in the house.

After the meeting, defendant telephoned his girlfriend, Barbara Murillo. Murillo testified that during the conversation defendant informed her he was "in trouble," relating that he had gotten into an argument with McConnell at her house, become angered and hit her, and that she fell and "went to sleep," although he "didn't mean for her to go to sleep."

Belmontes fled to Southern California where he was arrested by Ontario police six days after the murder. Blood found on the tongue of one of his shoes was tested and found to be "type O"—McConnell's blood type.

Defendant furnished three tape-recorded statements to investigators shortly after his arrest. In the first statement he denied any complicity in the crime, but inquired whether Bolanos or Vasquez had been taken into custody. In his second statement he admitted involvement; claiming the incident was planned as a "stupid little burglary." He had approached McConnell's house alone on foot; when she answered the door he entered and they just talked. He was not carrying the metal bar. When Bolanos drove up, defendant thought they would all talk a bit and leave. Instead, Vasquez came to the door and hit McConnell "two or three" times. They grabbed the stereo and ran.

In his third statement, defendant admitted he was armed with the dumbbell bar when he entered McConnell's house. After speaking with her for a few minutes, Vasquez arrived and pushed the front door open. McConnell immediately recognized Vasquez, who ordered defendant to "hit her." Defendant complied, hitting McConnell once in the head with the bar, knocking her to the floor. He proceeded to break down the rear bedroom door, search the closet, and remove the stereo components from the front of the house to Bolanos's car. He was not paying attention to Vasquez's actions

during this period, and did not observe how the victim came to have suffered 15 to 20 fatal blows to her head.

*Defense Case*

The prosecution proceeded on actual malice-deliberation, vicarious liability (conspiracy) and felony-murder theories. Belmontes's defense was that he abandoned all intent to go through with the burglary once he knocked on the door and discovered McConnell at home. He only entered the house to "play it out." Although he struck McConnell the one blow with the bar, it was only at Vasquez's direction; he did not intend to kill her. Vasquez must have dealt the additional fatal blows to McConnell while defendant was breaking into and searching the back rooms of the house.

Defendant testified in his own behalf. On Sunday morning, March 15, he and Bolanos went to Vasquez's house. Defendant had $7 remaining from his last paycheck and would not be paid again until April. Vasquez suggested they steal McConnell's stereo because she was a "snitch." Defendant had been to McConnell's house twice in the previous month. She was not a friend, however, and it meant nothing to him to "rip her off." He testified: "It was just something that came up. Everybody agreed on it, it happened. You can't tell what's going to happen from one day to the next."

They drove to Victor and parked a half block away from McConnell's house. The plan was for defendant to go to the door first, since McConnell would not let Vasquez or Bolanos inside but was unaware defendant knew them. Defendant, however, did not anticipate that McConnell would be home. Vasquez gave him the dumbbell bar to use to break a window. Defendant concealed it up his sleeve. Vasquez and Bolanos stayed in the car; defendant walked to McConnell's front door, knocked, and she answered. He told her he was hitchhiking and was stopping by because it was raining. McConnell invited him in. She noticed a bulge in his sleeve and asked what it was. Defendant showed her the bar, explaining he had it because he was hitchhiking; thereafter displaying it openly. He used McConnell's bathroom and then stood by the table and talked while she ironed clothes. She related that she was having problems with some people and asked him if he knew Domingo Vasquez. Defendant said he had met Domingo before.

Five minutes after defendant entered the house, Bolanos and Vasquez pulled into the driveway. McConnell started walking toward the front door. Defendant followed behind her and was placing the bar back up his sleeve when Vasquez rapped loudly on the door. According to defendant, the sequence of events was such that after pulling up Vasquez must have come

directly to the front door; he would not have had time to go to the trunk of Bolanos's car.

Vasquez pushed the door open, saw McConnell and ordered defendant to "hit her." Defendant followed Vasquez's directive and hit McConnell in the side of the head with the bar, using as much force as he could with a backhanded sweeping motion. She fell to the floor. Defendant dropped the bar, ran to the back bedroom, broke down the door, searched that room and the kitchen, and returned to the living room, all within a matter of several seconds. He did not enter or ransack the master bedroom, testifying it must have been Vasquez. Upon returning to the front of the house, defendant observed Vasquez standing in the same spot holding the metal bar. He had not seen Vasquez hit McConnell nor heard any blows landing, because he was not paying attention. He could not explain the presence of defensive bruises and contusions on McConnell's hands and feet.

Defendant testified he was "mad" and "disgusted" because Vasquez was just "standing there like a fool" not doing anything while he was running around the house "looking for something to take." Defendant told Vasquez to grab something; Vasquez picked up a speaker. Defendant ripped out the stereo wires and antenna, put the second speaker on top of the stereo unit, and told Vasquez to run. Vasquez ran out the back door; defendant followed close behind.

They loaded the stereo components into the trunk. Vasquez got in the back seat, defendant rode "shotgun side," and Bolanos drove. En route to Galt, Vasquez handed defendant the steel bar which had flesh and hair residue on it, stating he had to take out a witness. Defendant, still wearing his gloves, wiped blood off the bar and set it down on the floorboard. He was uncertain whether there was blood on his pants when he left McConnell's house; some might have come off the bar when he placed it on the floorboard. He denied having wiped any blood off of his shoes. Bolanos and Vasquez told him to throw the bar out his window into the river; he complied.

The three drove to Vasquez's brother Manuel's house. Defendant changed into a pair of Manuel's pants. Manuel contacted Raul Barron, whom they met at Vasquez's sister Irma's house. Defendant backed the car into her garage and plugged in the stereo; Barron bought it for $100. Bolanos, Vasquez and defendant drove to Lodi, divided the money, bought some beer, then drove to the home of an acquaintance to purchase narcotics.

Defendant's girlfriend, Barbara Murillo, was questioned as a hostile witness by the defense. She and defendant were living together in Lodi shortly

before the murder; at that time she had a two-year-old daughter by him and was pregnant with his second child. Six months after the murder she ran into Cobarrubio at the Grape Festival. Murillo believed defendant was the murderer. But when she asked Cobarrubio for further details about the crime, the latter claimed defendant had been "set up" because he had no backup in the area, while Vasquez had a network of local friends.

Cobarrubio was questioned on the matter. She recalled running into Murillo at the Grape Festival and being asked if defendant had committed the murder. She responded affirmatively. Murillo then asked Cobarrubio if she thought defendant "might have been set up." She replied: "Well, he might have." Cobarrubio testified further that in fact she had no information from any source that defendant had been set up. She had answered Murillo's inquiry to that effect because she knew defendant was protesting his innocence and felt sorry for Murillo, who seemed to still care about defendant.

## B. GUILT PHASE ISSUES

Defendant raises a number of contentions relating to the issue of guilt. None, as we shall show, warrants reversal.

### 1. *Validity of the Arrest Warrant*

Defendant asserts the invalidity of his arrest warrant on two grounds: (1) that it was facially invalid because it was based solely on the uncorroborated accusation of accomplice Robert Bolanos (see *People* v. *Campa* (1984) 36 Cal.3d 870 [206 Cal.Rptr. 114, 686 P.2d 634]); and (2) that material facts tending to negate the reliability of Bolanos's information were omitted from the affidavit in support of the warrant. (See *People* v. *Kurland* (1980) 28 Cal.3d 376 [168 Cal.Rptr. 667, 618 P.2d 213].) He argues that his bloodstained shoes and extrajudicial statements should have been suppressed as the fruits of his illegal arrest.

The arrest warrant was not challenged on these grounds in the trial court. ■ "[Q]uestions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal [citations]." (*People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048]; *People* v. *Easley* (1983) 34 Cal.3d 858, 869 [196 Cal.Rptr. 309, 671 P.2d 813]; see Evid. Code, § 353.) The contrary rule would deprive the People of the opportunity to make their record on the matter and cure the defect at trial. (*People* v. *Rogers, supra,* 21 Cal.3d at p. 548, and cases cited.) "Because of [his] failure to make a timely and specific objection on this ground

. . . the point must be deemed waived." (*People v. Green* (1980) 27 Cal.3d 1, 22 [164 Cal.Rptr. 1, 609 P.2d 468].)

While acknowledging trial counsel's failure to challenge the arrest warrant, defendant urges us to reach the merits of his claim on the ground that failure to do so constituted ineffective assistance of counsel. ■ In order to establish such inadequacy, he must demonstrate that counsel failed to perform with reasonable competence, and that it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings. (*People v. Fosselman* (1983) 33 Cal.3d 572, 583-584 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People v. Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Defendant has failed to meet his burden. Our review is limited to consideration of the facts established by the appellate record.

a. Reliability of Accomplice-informant Bolanos's Hearsay Statements

In *People v. Campa, supra,* 36 Cal.3d 870, we affirmed the trial court's determination that defendant's arrest was illegal because the affidavit in support of his arrest warrant failed to establish probable cause. There, a van had pulled alongside a car and, after a brief exchange of words between a passenger in the van and the driver of the car, the van passenger fired several shots into the car, wounding the driver and killing the passenger. Subsequent investigation led to one Richard Martinez, whose parents owned the van. Placed under arrest for murder and interrogated, Martinez admitted his participation in the incident, but stated Campa had done the actual shooting. A warrant was procured for Campa's arrest based upon Martinez's statement.

Since Campa's crime occurred prior to the adoption of Proposition 8, we applied principles of California constitutional law theretofore unimpacted by that initiative measure. (*People v. Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149].) We relied on *People v. Hamilton* (1969) 71 Cal.2d 176 [77 Cal.Rptr. 785, 454 P.2d 681], wherein we stated that "for an affidavit based on an informant's hearsay statement to be legally sufficient to support the issuance of a . . . warrant, two requirements must be met: (1) the affidavit must allege the informant's statement in language that is factual rather than conclusionary and must establish that the informant spoke with personal knowledge of the matters contained in such statement; and (2) the affidavit must contain some underlying factual information from

which the magistrate issuing the warrant can reasonably conclude that the informant was credible or his information reliable."[3] (*Id.,* at pp. 179-180.)

In *Campa* we concluded that accomplice Martinez's affidavit contained no factual information relative to his credibility—the second *Aguilar* prong, *supra,* 378 U.S. 108—other than that he was himself in custody on a murder charge and had admitted his participation in the crime. We explained further: "This is not to say that in all such cases the statement of a coparticipant implicating a suspect in criminal activity should be disregarded in finding probable cause for issuance of a warrant. Admissions may be made under circumstances in which their credibility is enhanced. Other 'indicia of reliability,' such as . . . corroborative evidence obtained independently may buttress the credibility of an arrestee's statement." (*Campa, supra,* 36 Cal.3d at pp. 883-884; see *People* v. *Scoma* (1969) 71 Cal.2d 332, 337-338 [78 Cal.Rptr. 491, 455 P.2d 419], and cases cited.)

■ Although the magistrate and parties below did not have the benefit of a reading of *Campa,* reasonably competent counsel at that time would have been familiar with the principles reiterated in this court's earlier cases which applied the *Aguilar-Spinelli* test. Here, the circumstances of the crime and evidence found at the crime scene—as summarized in the affidavit—corroborated Bolanos's statement. Bolanos asserted the murder was committed in the course of a burglary during which McConnell's stereo was stolen and later fenced—the affiant, Detective Holman, declared that the victim's house had been found ransacked. Bolanos stated defendant had beaten the victim with an iron bar causing defendant to become splattered with blood—such was consistent with the nature of the victim's injury ("blunt trauma to the head") noted in the autopsy results incorporated into the affidavit.

Moreover, although defendant stresses that Bolanos had a self-serving interest in "pegging" him as the actual killer, all three participants in the burglary (defendant, Vasquez and Bolanos) shared felony-murder liability

---

[3] In *Campa, supra,* 36 Cal.3d 870, we recognized that *Hamilton* and its progeny relied upon the "essentially identical two-part test" laid down by the United States Supreme Court in *Aguilar* v. *Texas* (1964) 378 U.S. 108, 114 [12 L.Ed.2d 723, 728-729, 84 S.Ct. 1509], and *Spinelli* v. *United States* (1969) 393 U.S. 410, 413 [21 L.Ed.2d 637, 641-642, 89 S.Ct. 584]. However, we deemed the *Aguilar* test "a convenient shorthand articulation of previously established principles of California law in the area of hearsay affidavits." (*Campa, supra,* 36 Cal.3d at p. 880.) In *Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527, 103 S.Ct. 2317], the Supreme Court abandoned the *Aguilar-Spinelli* "two-pronged test" and substituted a "totality-of-the-circumstances" analysis. Since McConnell was murdered prior to the effective date of Proposition 8 (June 9, 1982), we have no occasion to consider the effect, if any, of the United States Supreme Court's decision in *Illinois* v. *Gates* upon the facts of this case. (*Campa, supra,* 36 Cal.3d at p. 885, fn. 5.)

for McConnell's murder. In his statement, Bolanos confessed to his own role in the planning, participation and aftermath of the burglary; nothing therein suggested he had withdrawn from the criminal conspiracy at any time. Nor does defendant attempt to challenge the sufficiency of the affidavit to support his arrest under the warrant for *burglary*.

Mindful of the preference to be accorded warrants in doubtful or marginal cases (see *Campa, supra,* 36 Cal.3d at p. 884, and cases cited), trial counsel could reasonably have concluded that the affidavit contained sufficient corroboration of Bolanos's hearsay statement; that the arrest warrant thus issued on probable cause; and that a de novo motion to quash the warrant would have proved futile.[4] Defendant has not met his burden of showing that failure to challenge the warrant on this ground amounted to ineffective assistance of counsel.

### b. Omission of Material Facts From the Affidavit

Defendant argues there were four material omissions from the affidavit in support of the arrest warrant: (1) Deputy Holman had never heard the name Fernando Belmontes prior to Bolanos's statement, although Vasquez was on the police list of people recently in contact with the victim; (2) the black Chevy described by Lucy Flores, McConnell's neighbor, was traced to Bolanos and impounded before he furnished his statement; (3) Bolanos had initially reacted to police questioning by lying and denying any knowledge of the crime; and (4) his eventual inculpatory statement was prompted not by good citizenship, remorse or a guilty conscience, but rather by the police confronting him with his girlfriend's incriminating statements.

Recognizing that the record is incomplete because this claim was not litigated in the trial court to determine whether the omissions were intentional, reckless or negligent, defendant nevertheless urges us to reach the merits of his claim because the omissions were negligent "as a matter of law." For reasons already noted, the point has been waived on appeal. (*People* v. *Green, supra,* 27 Cal.3d at p. 22.)

Nor was trial counsel incompetent in failing to attack the arrest warrant on this ground. Prior to the effective date of Proposition 8, *Kurland* applied. (*People* v. *Kurland, supra,* 28 Cal.3d 376; see *In re Lance W.* (1985)

---

[4] We note that counsel did move to suppress the "fruits of defendant's arrest" on other grounds. Counsel sought exclusion of defendant's extrajudicial statements as involuntary; moved to suppress defendant's bloodstained shoes on the ground that their seizure was beyond the lawful scope of a search incident to arrest pursuant to warrant; and vicariously sought to suppress the fruits of Bolanos's statement to police on grounds that he was unlawfully detained, searched and arrested.

37 Cal.3d 873, 896 [210 Cal.Rptr. 631, 694 P.2d 744]; compare *Franks* v. *Delaware* (1978) 438 U.S. 154, 155-156 [57 L.Ed.2d 667, 672, 98 S.Ct. 674].) Although *Kurland* speaks to search warrants, the test is equally applicable to omissions from arrest warrants. (*People* v. *Anderson* (1983) 149 Cal.App.3d 1161, 1164 [197 Cal.Rptr. 413]; see *People* v. *Sesslin* (1968) 68 Cal.2d 418, 424 [67 Cal.Rptr. 409, 439 P.2d 321].)

Counsel could competently have concluded that the omitted facts were either immaterial, or their omission reasonable. ▮ In either situation no sanction is imposed and, assuming the affidavit otherwise supports probable cause, the warrant usually stands. (*Kurland, supra,* 28 Cal.3d at pp. 387-388.) Omissions are "material" only if they rendered the affidavit substantially misleading, i.e., if there was "a substantial possibility [the omitted facts] would have altered a reasonable magistrate's probable cause determination." (*Id.,* at p. 385.)

▮ It is difficult to see how the officer-declarant's unfamiliarity with defendant would have borne upon *Bolanos's* reliability—the precise matter at hand. Nor did omission of the fact that Bolanos's Chevy was impounded shortly before he furnished his statement diminish its reliability. If anything, inclusion of the fact that his vehicle had been identified would have corroborated his claim that he drove the participants to the crime scene. Nor would Bolanos's truthful statement—furnished after he learned his girlfriend had incriminated him—necessarily have been more reliable had it been shown to be motivated by "good citizenship" or "remorse." Inclusion in the affidavit of the circumstance that Bolanos's statement conformed to his girlfriend's report to police of what he had told her about the crimes would also have further enhanced its reliability. Lastly, although Bolanos may have initially denied knowledge of or involvement in the crime, it was his own incriminating admissions in his statement, together with other corroborative facts in the affidavit, upon which the magistrate could justifiably rely in assessing the reliability of Bolanos's statement.

Defendant has failed to show a "substantial possibility" that inclusion of these facts in the affidavit would have altered the magistrate's determination of probable cause. He has thus not met his burden of demonstrating that failure to attack the warrant on this ground constituted ineffective assistance of counsel.

### 2. *Admission of Defendant's Extrajudicial Statements*

▮ Defendant contends that his pretrial statements, in which he made inculpatory admissions of involvement in McConnell's murder, should have been suppressed as the involuntary products of threats and/or promises of

leniency by the homicide investigators. Specifically, he condemns the officers' use of the "technique of invoking the threat of the death penalty and then offering the hope of leniency through the means of confession."

Six days after the murder, San Joaquin Detectives Elbert Holman and Lyle Cooper, armed with the arrest warrant, traveled to San Bernardino County and took defendant into custody at his mother's home in Ontario. He was taken to the Ontario Police Department for questioning and advised of his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 649, 86 S.Ct. 1602, 10 A.L.R.3d 974]). Defendant acknowledged he understood his rights, waived them, and indicated his desire to speak with the officers. The waiver of rights and ensuing statement were tape-recorded.

In his first statement, defendant admitted knowing Bolanos, Vasquez and McConnell. He admitted having been to McConnell's house twice in January and February of that year. He had spent the previous weekend with Bolanos in Lodi. At first he claimed he had not been to Vasquez's house on the Sunday of the murder; thereafter he admitted having gone there. He claimed he had come to Ontario to be with his girlfriend. He denied having discussed burglarizing McConnell's residence while at Vasquez's house; being with Bolanos or Vasquez in Galt on Sunday morning; parking around the corner and walking to McConnell's house to break in; hitting her with the dumbbell bar as Bolanos and Vasquez were heard driving up; taking the stereo; attempting to throw the bar into the Mokelumne river; or selling the stereo in Lodi. When given an opportunity to ask questions, defendant wanted to know if Bolanos and Vasquez were already in custody, and was told they were in jail in Stockton charged with the murder. The interview was concluded and the tape recorder turned off.

Deputy Holman testified that after turning off the machine defendant was told they would be going back to Stockton. Holman stated to defendant: "Thanks for lying to me." When defendant expressed surprise, Holman added: "Why do you think we came down here and got you by name if we didn't know the story prior to coming down here?" Defendant asked for a minute to think about it, then indicated he wanted to "tell [Holman] what had happened." Holman advised defendant he would not continue taking the statement unless the tape recorder was turned back on, and this was done. Less than three minutes had elapsed since the conclusion of the first statement. Holman testified he did not recall either he or Deputy Cooper ever mentioning to defendant, in the two or three minutes that the tape recorder was turned off, that "this was a death penalty case." He recalled Deputy Cooper telling defendant that "the whole case was lying on him"; which Holman felt accurately characterized the status of the investigation

up to that point. Holman never told defendant they had him "dead to rights"; it was defendant who had first used that expression.

Deputy Cooper testified that during the break between statements, Holman told defendant he would be going back to Stockton to stand trial, that it was "a homicide case," that "he would have a long time to think about it," "and he may have even been told it was a—in our estimation a death penalty case. I don't recall if we told him that. [¶] I believe he was told there was no bail, again. That's about the extent of it. It was a very short conversation." Cooper testified that if the term "death penalty" was mentioned, it was not intended to scare defendant. Finally, his comment to defendant that "you want to clear it up so that its not all laying [*sic*] on you" was merely a reference in context to defendant's own earlier exclamation to that effect.

The transcript of the second tape-recorded statement supports the officers' testimony. Defendant indicates therein that Holman had not coerced him into making a second statement by use of the term "dead to rights"; that he had not been threatened or promised anything to make a second statement; that less than three minutes had elapsed since the tape recorder had been turned off; and that he had volunteered during the break that he had not been truthful in the first statement and now desired to level with the officers.

In his second statement—which defendant testified he furnished "because only three people knew what had happened, yet the deputies seemed to know everything"—defendant claimed the incident was planned as a "stupid little burglary." He approached McConnell's house alone on foot; when he knocked and found her home he entered and they talked. He was not carrying the metal bar. When Bolanos drove up, he thought they would all talk some more and leave. Instead, Vasquez came to the door and hit McConnell "two or three" times. They grabbed the stereo and ran. The rear bedroom was never ransacked. Bolanos and Vasquez told him to throw the bar out the car window. He got some blood on his pants but thought Vasquez did too.

Defendant's third tape-recorded statement was taken on the following day in the San Joaquin County jail. He was again *Mirandized,* waived his rights, and does not here challenge the voluntariness of that statement on separate grounds. He admitted therein to being armed with the dumbbell bar upon entering McConnell's house. After speaking with her for a few minutes, Vasquez arrived and pushed the front door open, McConnell immediately recognized him, Vasquez ordered defendant to "hit her," and defendant complied. He claimed he hit McConnell only once in the head with the bar, knocking her to the floor. He proceeded to break down the

bedroom door, search the closet, then remove the stereo components from the front of the house to Bolanos's waiting Chevy. Defendant stated he did not pay attention to Vasquez's actions during this period, nor did he directly observe how McConnell came to have suffered the 15 to 20 fatal blows to her head.

■ The burden is on the prosecution to prove the voluntariness of a confession beyond a reasonable doubt. (*People v. Murtishaw* (1981) 29 Cal.3d 733, 753 [175 Cal.Rptr. 738, 631 P.2d 446]; *People v. Jimenez* (1978) 21 Cal.3d 595, 608 [147 Cal Rptr. 172, 580 P.2d 672].) That requirement applies equally to a defendant's incriminating admissions. (*Murtishaw, supra,* 29 Cal.3d at p. 753.)

■ It is well settled that "mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary." (*Jimenez, supra,* 21 Cal.3d at p. 611.) As we stated in *People v. Hill* (1967) 66 Cal.2d 536 [58 Cal.Rptr. 340, 426 P.2d 908], the distinction between permissible and impermissible police conduct "does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by the defendant if he speaks the truth as represented by the police." (*Id.,* at p. 549.) In terms of assessing inducements assertedly offered to a suspect, " '[w]hen the benefit pointed out by the police . . . is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made [citation]." (*Jimenez, supra,* 21 Cal.3d at pp. 611-612.)

■ Our role as a reviewing court is " ' "to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found . . . ." [Citations.]' " (*People v. McClary* (1977) 20 Cal.3d 218, 227 [142 Cal.Rptr. 163, 571 P.2d 620].) If there is "conflicting testimony, the court must 'accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' [Citation.]" (*People v. Hogan* (1982) 31 Cal.3d 815, 835 [183 Cal.Rptr. 817, 647 P.2d 93].)

■ Our independent review convinces us that no improper threats or promise of leniency were made to defendant. Deputy Holman testified that he did not, as defendant contends, "threaten him with the death penalty." Deputy Cooper's best recollection was that the term "death penalty" *may* have been mentioned at some point, but that if it was, it was not done so with intent to scare or coerce defendant into confessing. To the extent their testimony conflicted on whether the "death penalty" was ever mentioned,

we must accept that version most favorable to the People. (*People* v. *Hogan, supra,* 31 Cal.3d at p. 835.)

Moreover, defendant's own responses at the beginning of his second tape-recorded statement support the officers' testimony that he was not "threatened" with the death penalty, nor were any promises of benefit or leniency offered as inducement for his statements. Belmontes acknowledged he lied in all three of his statements to police. He testified his intent during the first statement was to deny everything: "I was holding my mug." His intention in his second statement was to tell enough of the truth so that he would be believed, but no more than necessary. Defendant's own behavior and testimony virtually precludes a conclusion that his free will was overborne by the substance or manner of the interrogation. (See *People* v. *Johns* (1983) 145 Cal.App.3d 281, 292-293 [193 Cal.Rptr. 182].)

Nor does the record support defendant's further assertion that the officers unduly coerced his statements by falsely suggesting that Vasquez and Bolanos were claiming he was the lone murderer because he was not a "home boy." At the time of defendant's questioning, Bolanos and Vasquez were in custody for the murder, and Bolanos had related that defendant went into the house first and thereafter came out with blood on him. Based upon the information they had at that point, it was reasonable for the officers to suspect defendant as the actual killer. Defendant acknowledged that it was the factual detail revealed in the officers' questions which led him to conclude that Vasquez and Bolanos had "snitched him off."

Applying the applicable standards to the facts, we conclude that the trial court properly ruled the statements admissible.

3. *Defense Counsel's Potential Conflict of Interest*

One week after the filing of the information and prior to severance, the public defender, representing codefendant Vasquez, filed a motion to recuse defendant's trial counsel, John Schick, on grounds of an alleged conflict of interest stemming from Schick's "prior representation" of Vasquez. Schick was a named partner in the law firm which prior to 1980 had been under contract as the conflict public defender for San Joaquin County. Two years earlier, another attorney in Schick's law firm had represented Vasquez on another murder charge. That case never went to trial; the charge against Vasquez was ultimately dismissed.

In opposing his recusal, Schick filed a declaration in which he stated (1) that he was not in possession of any information relating to this case obtained through any confidential communication with Vasquez; (2) that he

had made no personal appearances on behalf of Vasquez; and (3) that the office file on Vasquez's 1979 case had been destroyed over eight months earlier. At the hearing on the motion, Schick further represented that the attorney who had represented Vasquez in 1979 was no longer employed in his firm and was in private practice in Manteca. Vasquez's counsel conceded that "[c]ertainly if there were to be a severance granted, then that would go a long way towards clearing up those [potential conflict of interest] kinds of problems. But at this point as the District Attorney indicated, that is not necessarily the case. So I feel the problems are still there."[5]

The court denied the motion to recuse Schick, concluding that under the circumstances there was no conflict of interest nor the potential for one to arise. Defendant was present and heard counsel's representations and arguments at the hearing. At its conclusion, defendant was asked: "Do you wish and is that still your desire to have [Schick] represent you?" Defendant responded, "Yes."[6]

 Defendant argues that reversal is required due to a conflict or potential conflict of interest arising from Schick's law firm's prior representation of Vasquez.

 "It has long been established that 'the "assistance of counsel" guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests.' (*Glasser* v. *United States* (1942) 315 U.S. 60, 70 [86 L.Ed. 680, 699, 62 S.Ct. 457]; accord *People* v. *Chacon* (1968) 69 Cal.2d 765, 774 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454].)" (*Leversen* v. *Superior Court* (1983) 34 Cal.3d 530, 536-537 [194 Cal.Rptr. 448, 668 P.2d 755].) Although the classic conflict situation involves joint representation of codefendants in the same action, "[t]he same principles apply when counsel represents clients whose interests may be adverse even when they are not codefendants in the same trial. [Citations.]" (*People* v. *Mroczko* (1983) 35 Cal.3d 86, 105 [197 Cal.Rptr. 52, 672 P.2d 835].)

---

[5] Defendant's and Vasquez's cases were thereafter severed on August 31, 1981.

[6] In a related matter, the court granted Vasquez's motion to recuse an investigator whom Schick had hired to work on Belmontes's case, because the investigator was still employed in the public defender's office on a part-time basis at the time Schick retained his services. In so ruling, the court stated it "was satisfied without any question . . . [the investigator] did not have any information or was not privy to any that would have been of conflict in any way in this particular case." The investigator was nevertheless recused "[s]o there wouldn't be any thought he might have information that in some way came to him later."

In connection with that ruling, the court had again asked defendant if he "wanted other counsel based on [the investigator's] employment," to which he replied: "No, I'll stay with the lawyer I have."

"When a trial court undertakes to appoint counsel for indigent codefendants (see *People* v. *Chacon* [1968] 69 Cal.2d 765 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454]), it must assume the burden of assuring that its appointment does not result in a denial of effective counsel because of some possible conflict. [Citations.]" (*People* v. *Cook* (1975) 13 Cal.3d 663, 671 [119 Cal.Rptr. 500, 532 P.2d 148], cert. den. (1975) 423 U.S. 870 [46 L.Ed.2d 100, 96 S.Ct. 135]; *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606, 612 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333].) Where the evidence conflicts "concerning the nature and extent of the past and present attorney-client relationship, the trial court's findings based upon such conflicting evidence are conclusive on appeal. [Citations.]" (*People* v. *Yorn* (1979) 90 Cal.App.3d 669, 674 [153 Cal.Rptr. 295].)

We have held that "even a potential conflict may require reversal if the record supports 'an informed speculation' that appellant's right to effective representation was prejudicially affected." (*People* v. *Mroczko, supra,* 35 Cal.3d at p. 105.) But "[p]ermissible speculation giving rise to a conflict of interest may be deemed an informed speculation . . . only when such is grounded on a factual basis which can be found in the record." (*People* v. *Cook, supra,* 13 Cal.3d at pp. 670-671.)

Here the record does not establish an actual or potential conflict of interest. Attorney Schick, an officer of the court, " ' "[was] in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." [Citation.]' " (*People* v. *Mroczko, supra,* 35 Cal.3d at p. 112.) He represented to the court that he personally had no prior contact with Vasquez. The attorney from Schick's firm who had handled Vasquez's earlier case was now in private practice in another locale; the file in that case had long since been destroyed.

Alternatively, defendant urges that Schick's ethical obligations to his firm's former client precluded him—perhaps subliminally—from fully exploiting Vasquez's prior criminal record in the presentation of Belmontes's defense. At oral argument appellate counsel suggested that Schick might have "self-censored himself" as a result of the conflict; at another point counsel took an opposite tack, suggesting Schick "didn't see the potential for conflict."

Trial counsel's performance, however, lends little support to the argument. Throughout the guilt and penalty phases Schick characterized Vasquez as the "ringleader" of the planned crime, emphasizing that Vasquez was older than defendant, and urging the jury to consider Vasquez's reputation in the local community; his infidelity and mistreatment of Carrie Rogers who was supporting him; his former relationship with the victim; his

threats to her right up through the morning of the murder; and his motive—consistent with defendant's claims—to do harm to McConnell, who had thrown him out of her house after he "ripped her off" several days prior to the murder. Further evidence of Vasquez's prior "specific instances of violent conduct," especially an earlier *charge* (the 1979 murder charge) *which had been dismissed,* would have been inadmissible to prove his conduct in the instant criminal episode. (Evid. Code, § 1101, subd. (a); Witkin, Cal. Evidence (2d ed. 1966) § 324, p. 287.) Moreover, given that the prosecution was proceeding on felony murder and conspiracy theories of vicarious liability, trial counsel had to weigh the tactical disadvantages of having the defense strengthen the case against Vasquez, thereby enhancing defendant's vicarious liability for Vasquez's criminal acts in the jurors' eyes.

The record affords no informed basis for concluding that a conflict of interest existed or affected trial counsel's performance to defendant's detriment.[7]

### 4. *Admissibility of Bolano's and Cobarrubio's Prior Consistent Statements*

■■■ Defendant contends that evidence of prior consistent statements of Bolanos and his girlfriend, Teresa Cobarrubio, were erroneously admitted without meeting the foundational requirements of Evidence Code sections 791 and 1236.[8]

Bolanos testified that he told Cobarrubio on the day after the murder defendant was the one who had killed McConnell during the burglary. No timely objection having been made to this testimony; the point has been waived on appeal. (*People* v. *Cannady* (1972) 8 Cal.3d 379, 388 [105 Cal.Rptr. 129, 503 P.2d 585]; *People* v. *Green, supra,* 27 Cal.3d at p. 22.) Defendant's purported citation to an objection on this point is unavailing. The "objection" he notes in the record went to Bolanos's testimony on a

---

[7] *In so concluding, we need not reach defendant's further claim that his waiver of the potential conflict of interest was not a knowing and informed one.*

[8] Section 1236 provides: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791."

Section 791 provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after:

"(a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or

"(b) An express or implied charge has been made that his testimony at the hearing is recently fabricated . . . and the statement was made before the . . . motive for fabrication . . . is alleged to have arisen."

different matter (his initial false statement regarding the disposal of McConnell's stereo); was made on a nonhearsay ground; and was raised well beyond the point at which Bolanos gave the testimony here challenged.

Cobarrubio's testimony confirmed that Bolanos told her defendant had killed McConnell. This time there was an objection; to which the prosecutor responded: "We're offering it as a prior statement of Mr. Bolanos, given at a time when the motive imputed to him for why he should want to lie didn't exist."

One motive for fabrication or bias in Bolanos's testimony, explored at length during his cross-examination, was his favorable immunity agreement obtained in exchange for his testimony at defendant's trial. Defendant himself recognizes: "Of course Bolanos also had a strong motive to shift as much legal and moral culpability away from himself and on to the others [Belmontes and Vasquez] as well."

Bolanos had not yet been granted immunity from prosecution for the murder at the time he related the prior statement—consistent with his trial testimony—to Cobarrubio. An immunity agreement has been recognized as a motive for bias within the meaning of Evidence Code section 791. (*People v. Pic'l* (1981) 114 Cal.App.3d 824, 862-863 [171 Cal.Rptr. 106].) "That there may always have existed another motive for fabricating did not deprive the prosecution of its right to show that a motive shown by the evidence did not affect the witness' testimony [citation]." (*People v. Cannady, supra,* 8 Cal.3d at p. 388.) Bolanos's prior consistent statement to Cobarrubio was thus admissible under Evidence Code section 791, subdivision (b).

Lastly, Deputy Gary Coffey testified about the statement he took from Cobarrubio prior to Bolanos's questioning and arrest. There was a hearsay objection; the prosecutor responded that evidence of Cobarrubio's prior statement was "being offered to rehabilitate her, after counsel suggested she was lying on the stand. . . ."

Counsel impeached Cobarrubio on cross-examination with her statement to defendant's girlfriend, Barbara Murillo, made several months after the crime, to the effect that she might have agreed with Murillo that defendant could have been "set up." This statement was inconsistent with Cobarrubio's trial testimony. Evidence of her earlier statement to Deputy Coffey was inconsistent with her statement to Murillo—consistent with her trial testimony—and thus admissible as a prior consistent statement. (Evid. Code, §§ 791, subd. (a) & 1236.)

### 5. *Curtailment of Impeachment of Prosecution Witness Carrie Lynn Rogers*

 Defendant argues that the court improperly restricted his cross-examination of prosecution witness Carrie Lynn Rogers regarding her motive for bias and fabrication.

On the date of the offense, Domingo Vasquez was living with Rogers, their daughter, and a friend, Laura Hernandez. Rogers subsequently married Vasquez in jail three months after his arrest for McConnell's murder. Vasquez's motion to dismiss the felony-murder-burglary special circumstance as to him was granted. He ultimately pled guilty to second degree murder and second degree burglary and was sentenced to an indeterminate term of 15 years to life.

Rogers did not come forward to implicate defendant as the actual killer until shortly before the start of his trial. On direct examination, she testified that after the crime Vasquez refused to tell her why he had been picked up for questioning by the police. On the night following the murder, while in her kitchen, she overheard defendant discussing the murder with Vasquez and Bolanos in the living room, and heard defendant review how he had first entered McConnell's house alone and hit her several times with the bar, after which Vasquez had joined him in the house.

Prior to Rogers's cross-examination, defense counsel moved for permission to question her about the disposition of Vasquez's case. The theory of relevance was that Rogers's belated claim that defendant was the killer was motivated by her desire to promote her husband's chances for early release on parole. Defendant asserts that "[t]he indeterminate sentence disposition of Domingo Vasquez's case and the wide range of potential prison confinement provided Carrie Rogers Vasquez with a powerful motive to portray [defendant] as the ringleader and killer. An early release—or indeed any release—of Vasquez depends in large measure upon his involvement in the offense and his level of culpability. Mrs. Vasquez could well be expected to so understand, believe or hope. The jury was deprived of powerful impeachment evidence."

The prosecutor countered that there was undue potential for prejudice and misuse of the information,[9] and that counsel's theory of relevance for

---

[9] The jury was not told of Vasquez's negotiated plea to second degree murder, since the plea did not necessarily admit his role as the actual killer, could have been based on felony-murder-accomplice liability, and thereby could have served to enhance the prosecution's case against defendant. Evidence of Vasquez's *disposition* (an indeterminate prison term) was irrelevant to a determination of defendant's degree of participation or role in the crimes.

impeachment was highly speculative. The court prohibited cross-examination in this vein.

We recognize that " '[w]hile the trial judge has broad discretion to control the ultimate scope of cross-examination designed to test the credibility or recollection of a witness (*People* v. *Burton* (1961) 55 Cal.2d 328, 343 [11 Cal.Rptr. 65, 359 P.2d 433]) . . .' " (*Jennings* v. *Superior Court* (1967) 66 Cal.2d 867, 877 [59 Cal.Rptr. 440, 428 P.2d 304]), "wide latitude" should be given to cross-examination designed to test the credibility of a prosecution witness in a criminal case. (*Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 715 [87 Cal.Rptr. 361, 470 P.2d 345].) Nevertheless, we are unpersuaded by defendant's argument that the ruling was so unduly restrictive as to violate his Sixth Amendment right of confrontation.

In *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 680 [89 L.Ed.2d 674, 684, 106 S.Ct. 1431], the United States Supreme Court reaffirmed that "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' *Davis* v. *Alaska* [(1974) 415 U.S. 308, 94 S.Ct. 1105], at 318."

"But *Van Arsdall* emphasized that a trial judge has broad latitude in restricting cross-examination which is repetitive or only marginally relevant. (*Id.* [475 U.S. 673, 679-680].) There is no Sixth Amendment violation at all unless the prohibited cross-examination might reasonably have produced 'a significantly different impression of [the witness's] credibility. . . .' (*Id.* [475 U.S. 673, 680].) If cross-examination was improperly restricted, the prejudicial effect of the error on the trial as a whole depends on a multitude of factors, including the cumulative nature of the lost information, the extent of cross-examination otherwise permitted, the degree of evidence corroborating the witness, and the overall strength of the prosecution case. (*Id.* [475 U.S. 673, 684].)" (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 751, fn. 2 [230 Cal.Rptr. 667, 726 P.2d 113].)

Here the jury learned Rogers had been with Vasquez for eight years and had married him shortly after his arrest for McConnell's murder; that they had a daughter together; that she was seeing Vasquez on a weekly basis at the time of trial; that she had been living with Vasquez and supporting him on the date of the murder; that she knew Vasquez was keeping company with other women at that time and nonetheless "didn't do anything about it"; and that she did not come forward to report her information inculpating defendant as the killer until the eve of his trial. Nor did the prosecutor

in his closing argument make any attempt to clothe Rogers with a false aura of veracity.[10]

We conclude the trial judge was within his discretion in ruling that the proffered line of cross-examination was potentially prejudicial and would not reasonably have produced "a significantly different impression of [Rogers's] credibility. . . ." (*Van Arsdall, supra,* 475 U.S. at p. 680 [89 L.Ed.2d at p. 684].) Even were we to assume error of constitutional magnitude, given the totality of circumstances under which Rogers's testimony was presented—particularly defendant's own testimony that he struck McConnell at least the one blow with the bar—no prejudice warranting reversal would be shown.

### 6. *Conflicting Instructions on Evaluation of Accomplice Testimony*

 Defendant acknowledges that the court gave the full panoply of standardized instructions advising the jury that Bolanos was an accomplice as a matter of law (CALJIC No. 3.16); defining "accomplice" (CALJIC No. 3.10); and advising that his testimony had to be viewed with distrust (CALJIC No. 3.18) and needed corroboration (CALJIC Nos. 3.11 and 3.12). Defendant claims, however, that the purpose of these instructions was undermined to his prejudice by the giving of CALJIC No. 2.27, which allows the jury to find any fact on the testimony of one witness, and CALJIC No. 2.11.5, which cautions the jury against speculation as to the prosecution or nonprosecution of accomplices.

### a. CALJIC No. 2.27

 CALJIC No. 2.27 was requested *by defendant.* Trial counsel never proposed that it conflicted with the accomplice testimony corroboration requirement. Nevertheless, since the corroboration requirement of section 1111 is a "substantial right" we shall address the claim. (§ 1259; *People* v. *Chavez* (1985) 39 Cal.3d 823, 830 [218 Cal.Rptr. 49, 705 P.2d 372].)

---

[10]The prosecutor conceded in his opening argument: "[C]ounsel has suggested to you [Rogers] has a very definite interest in protecting a man, Domingo Vasquez, with whom she lives. Certainly, ladies and gentlemen of the jury, somebody that would marry someone who's been involved in something like this, when he's been cheating on her and she knows about it, that's loyalty. What else can you call it? [¶] And you have to take that into account in deciding whether to believe [Rogers]. Let's face it. That really calls into question her story." Defense counsel picked up the thread in his own closing argument: "Carrie Rogers—and I certainly would second [the prosecutor's] comments about Carrie Rogers' motives to come in here and lie for a man who she has certainly stood by through thick and thin who certainly has not stood by her." And in his closing argument, the prosecutor invited the jury to discount Rogers's testimony "because she is loyal to Domingo."

In *Chavez, supra,* we held that the giving of CALJIC 2.27 in conjunction with accomplice instructions was not error per se, but we agreed with the suggestion of the Court of Appeal in *People* v. *Stewart* (1983) 145 Cal.App.3d 967, 975 [193 Cal.Rptr. 799], that it should contain an explicit reference to testimony requiring corroboration. (*Chavez, supra,* 39 Cal.3d at p. 831.)

As in *Chavez,* here, looking to the instructions as a whole we find no error. (*Id.,* at pp. 830-831.) Both the prosecution and the defense proceeded on the premise that corroboration was needed. (*Id.,* at p. 831.) The prosecutor reiterated in his closing argument that Bolanos's testimony needed to be corroborated, cautioned that it must be viewed with distrust, and summarized the evidence which he believed would support defendant's guilty verdicts independent of Bolanos's testimony. Bolanos himself conceded that he was testifying because: "I'm ordered here or else that murder case would be up on me again if I'm not here," and acknowledged that he was more concerned about his own fate than that of defendant or Vasquez.

Moreover, the record belies defendant's assertion that Bolanos's testimony "went almost completely uncorroborated." It was corroborated by the testimony of Lucy Flores, Carrie Rogers, defendant's girlfriend Barbara Murillo, and crucially, by defendant himself. He admitted, both in his extrajudicial statements and trial testimony, that he first entered McConnell's house alone; dealt her the first blow with the iron bar; implored Vasquez to grab the stereo components and run; exited with blood on his clothes; wiped blood off the bar; and threw it in the river. He confirmed Bolanos was the "wheel man" and never entered the house. The murder weapon, recovered with Bolanos's assistance; defendant's bloodstained shoe; the number and severity of McConnell's head wounds; and the autopsy physician's testimony (that infliction of the blows would have made sounds like "a cracked pot"); all further corroborated Bolanos's account of the crimes.

We conclude there was no prejudicial error from the giving of unadorned CALJIC No. 2.27.

b. CALJIC No. 2.11.5

 CALJIC No. 2.11.5 instructs: "There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which defendant is on trial. [¶] You must not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted."

There is no merit to defendant's claim that, so charged, the jury might have believed it was prohibited from considering the "nonprosecution" of Bolanos. The instruction was patently directed at Vasquez. The jury knew Bolanos had pled guilty to burglary, was awaiting imposition of sentence therefor, and had been granted immunity from prosecution for McConnell's murder. Defendant's suggestion that the jury might have understood CALJIC No. 2.11.5 as applying to Bolanos, thereby precluding them from weighing the existence or nonexistence of bias, interest or other motive in assessing his credibility (see CALJIC No. 2.20), is implausible. It would require us to find that the jury rejected nearly all of the accomplice testimony instructions and disregarded as irrelevant counsel's considerable efforts to impeach Bolanos in his cross-examination and closing argument.

Defendant further argues that the instruction "might have misled the jury into believing that Vasquez was not being prosecuted, although they could not consider why." He hinges this contention on the predicate in the instruction: "You must not discuss or give any consideration as to why [a possible accomplice] is not being prosecuted in this trial. . . ." In doing so he ignores the concluding clause of the instruction, which states: "or whether he has been or will be prosecuted." The instruction in its entirety itself defeats his claim.

### 7. Instruction on Defendant's Failure to Deny or Explain Certain Evidence (CALJIC No. 2.62)

The jury was instructed with CALJIC No. 2.62 (1980 rev.), which pertains to the inferences that might be drawn from defendant's failure to explain or deny prosecution evidence of facts within his personal knowledge. "It correctly explained that defendant has a constitutional right to decline to testify, but that his failure to deny or explain facts within his personal knowledge may be considered as supporting the prosecution evidence at issue. It also correctly advised that such failure to deny or explain does not create any presumption or warrant any inference of guilt, or relieve the prosecution of its proof burden." (*People* v. *Ghent* (1987) 43 Cal.3d 739, 763 [239 Cal.Rptr. 82, 739 P.2d 1250].) There was no objection to the instruction.

Defendant contends that "[t]he instruction in conjunction with the prosecutor's argument constituted prejudicial error because (1) the record discloses that [defendant] did *not* fail to explain or deny any prosecution evidence; and (2) the purported failures to explain or deny argued by the prosecution were tangential, collateral and of little importance."

We disagree on both counts. Defendant testified he heard Bolanos and Vasquez drive up, and that Vasquez came right to the front door and would

not have had time to open Bolanos's trunk. But as the prosecutor argued, defendant failed to explain Bolanos's conflicting testimony, corroborated by the testimony of a disinterested neighbor (Lucy Flores), that Vasquez *did* first attempt to open the trunk before entering the house.

Defendant testified he struck McConnell the one blow to the head with the bar, and that she fell to the ground but was "still breathing." But he failed to explain the autopsy surgeon's conflicting conclusion that the injury resulting therefrom in probability would not have rendered McConnell unconscious, nor how the victim would come to have suffered the many defensive wounds—clearly evidencing her struggle for life as she was being beaten—if his version was true.

Defendant testified that he ran through the rear of the house looking for things to steal, returning within seconds to find Vasquez standing over McConnell holding the bar. He denied ransacking the front master bedroom, testifying it "[m]ust have been [Vasquez]." But as the prosecutor fairly argued, defendant failed to explain how Vasquez could have beaten the victim so extensively *and* ransacked the master bedroom; all in a matter of "seconds." Defendant also claimed he neither saw nor heard Vasquez beating McConnell because he was not "paying attention," but he failed to explain how he could not have heard the 15 to 20 blows to the victim's head, which Bolanos heard from outside the house, and which, according to the autopsy surgeon, in all probability would have sounded "like a cracked pot" as they landed, cracking the victim's skull.

There were other crucial points of conflict between defendant's extrajudicial statements and trial testimony on the one hand, and the physical evidence and testimony of witnesses on the other. Without belaboring the point, our review of the record indicates that these and other such conflicts were hardly "tangential, collateral and of little importance." "[I]f the defendant tenders an explanation which, while superficially accounting for his activities, nevertheless seems bizarre or implausible, the inquiry whether he reasonably should have known about circumstances claimed to be outside his knowledge is a credibility question for resolution by the jury [citations]." (*People* v. *Mask* (1986) 188 Cal.App.3d 450, 455 [233 Cal.Rptr. 181].)

8. *Doyle - Massiah Error*

 Defendant contends that the prosecutor committed *Doyle* error (*Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240]) when he cross-examined defendant regarding his postarrest silence. He further asserts that those same questions violated his right to counsel. (*Massiah* v.

*United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199].) We conclude that under the circumstances the prosecutor's questions had the potential to, but did not, ripen into *Doyle* error. Nor did they infringe upon defendant's Sixth Amendment rights.

The offending colloquy went as follows:

"[PROSECUTOR ]: Q. Mr. Belmontes, from the time you talked to Deputy Holman and Deputy Cooper at the San Joaquin County Jail on March 22nd, 1981, until today in this very courtroom you have never spoken to law enforcement concerning what happened on March 15th, 1981?

"[DEFENDANT ]: A. Have I spoken to officers?

"Q. About it. That's right.

"A. From the first day I got arrested until now?

"Q. No. From the jail statement on Sunday, when you were booked in the county jail and gave the third statement we have been calling the jail statement, until now you've never told law enforcement officers about it, anything else that happened there?

"A. No.

"[DEFENSE COUNSEL ]: Judge, in fairness, I think the jury should be instructed once he's appointed an attorney, that conversation has to be directed through the attorney.

"[THE COURT ]: Yes. The question, ladies and gentlemen, is somewhat misdirected in the sense that Mr. Belmontes does not have to talk to anybody. As a matter of fact, he's admonished by his counsel, once lawyers have been appointed to represent him, not to talk to anybody. You should be aware of that fact. Without the presence of the lawyer.

"[PROSECUTOR ]: Q. All right. So from then until now you haven't been on the record about what happened?

"[DEFENDANT ]: A. Not on the record. But a few times Officer Holman has taken me to court while we were in Lodi we talked about it. But not on record.

"Q. About the details of the offense?

"A. Not really details. Just told him that I didn't do it. Told him that I was serious about when I said I hit the girl one time."

The petitioners in *Doyle* were arrested on narcotics charges. They were given *Miranda* warnings (*Miranda* v. *Arizona, supra,* 384 U.S. 436), made no postarrest statements about their involvement in the crime, and for the first time at trial contended they had been framed by a government informant. During cross-examination the prosecutor repeatedly sought to impeach their exculpatory story by asking them why they had failed to assert the "frame-up" defense earlier. The trial court overruled defense counsel's timely objections to this line of inquiry, and permitted the prosecutor to argue petitioners' postarrest silence to the jury. (*Doyle, supra,* 426 U.S. 610 at pp. 613-615, and fn. 5 [49 L.Ed.2d 91 at pp. 95-96].) The high court reversed the convictions, holding that *Miranda* prohibited such questioning and argument as a proper means of impeachment. (*Id.,* at p. 617 [49 L.Ed.2d at p. 97].)

Here, the prosecutor did not ground his case on the theory that defendant had refused to talk to the police. Defendant waived his *Miranda* rights and furnished three statements. He testified that he voluntarily spoke with the officers about the crime en route from Southern California back to Stockton. In short, there were no *facts* supportive of an inference of "postarrest silence" placed before the jury. Indeed the defense itself urged that defendant's trial testimony was essentially consistent with his jailhouse statement made over a year earlier.

The Attorney General argues that the prosecutor's questions were merely designed to point out the inconsistencies between defendant's extrajudicial statements and trial testimony—a permissible avenue of impeachment. (See *People* v. *Barker* (1979) 94 Cal.App.3d 321, 329-330 [156 Cal.Rptr. 407]; *People* v. *Farris* (1977) 66 Cal.App.3d 376, 390 [136 Cal.Rptr. 45]; *People* v. *Love* (1977) 75 Cal.App.3d 928, 934 [142 Cal.Rptr. 532].) Perhaps that is where they were intended to lead. As worded, however, they just as readily could have elicited defendant's testimony that he made no statements about the crime *between* his third jailhouse statement and trial, and thus technically ran afoul of *Doyle, supra,* 426 U.S. 610.

But upon counsel's objection to the questions, the trial judge immediately admonished the jury that "Mr. Belmontes does not have to talk to anybody" and that "he's admonished by his counsel . . . not to talk to anybody." (See *Greer* v. *Miller* (1987) 483 U.S. 756, __ [97 L.Ed.2d 618, 630-631, 107 S.Ct. 3102] [similar curative admonition].) "Unlike the prosecutor in *Doyle,* the prosecutor in this case was not 'allowed to undertake impeachment on,' or 'permit[ted] . . . to call attention to,' [defendant's]

silence." (*Id.*, at p. __ [97 L.Ed.2d at pp. 630-631], quoting *Doyle, supra,* 426 U.S. at p. 619, & fn. 10 [49 L.Ed.2d at p. 98].)

Any error was clearly harmless beyond a reasonable doubt. (*Greer* v. *Miller, supra,* 483 U.S. at p. __ [97 L.Ed.2d at p. 630]; *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; cf. *People* v. *Jackson* (1980) 28 Cal.3d 264, 305 [168 Cal.Rptr. 603, 618 P.2d 149].) The prosecutor's questions were brief and unaccompanied by any suggestion that an inference of guilt should be drawn therefrom. Belmontes presented virtually no defense to the overwhelming evidence that a felony murder had occurred, namely, a murder committed in the course of a burglary. (§ 189.) The evidence further supported the jury's findings that he personally, intentionally, and wilfully administered the fatal beating to McConnell. When asked on direct examination: "Did you contribute to her death?" defendant replied: "Yes." When asked "How?" he acknowledged: "I was involved. I hit her. . . ." Although he claimed he struck McConnell only the one blow across her temple, that wound was apparently of insufficient force to lacerate the victim's skin—a circumstance wholly inconsistent with his own admission that he was covered with blood and that he alone had to change his pants at Manuel Vasquez's house after the crime. The nature of McConnell's gaping head wounds; the blood splattered about defendant's face, clothing, and the walls and door jambs next to where she was found; and the many defensive bruises on her arms, hands, legs and feet all evidenced a desperate struggle for life as defendant bludgeoned her with the iron bar.

We likewise reject defendant's related claim under *Massiah* v. *United States, supra,* 377 U.S. 201. There is no showing that the officers in this case at any stage of their investigation transgressed defendant's Sixth Amendment right to counsel. Having concluded that defendant's "postarrest silence" was neither shown by the evidence nor urged before the jury, we decline his further invitation to speculate that the prosecutor's complained-of questions "attribut[ed] a consciousness of guilt to the defendant for following his lawyer's advice . . ." and remaining silent.

### 9. *Uncharged Conspiracy Instructions*

Both defendant and Bolanos revealed in their pretrial statements that they met with Vasquez at the latter's house on the morning of the murder and specifically agreed and conspired to burglarize McConnell's house. Defendant admitted in his statement that overt acts were carried out in furtherance of the planned crime prior to the point at which he knocked on McConnell's door and found her home. He had armed himself with the bar and split up from his cohorts who, according to predesigned plan, were to

meet him at the house at a given time and assist in loading the stolen items into the trunk of Bolanos's Chevy.

However, defendant's claim that he personally abandoned any intent to steal when McConnell bid him entry, and his further assertion that shortly thereafter Vasquez had forced entry into the home and commanded him to strike the victim, were also reflected in his statement. Anticipating what would likely be the gist of Belmontes's defense in light of his pretrial statements, the prosecutor elected to proceed on an alternative uncharged conspiracy theory of vicarious liability in addition to the actual malice-premeditation and felony-murder theories of guilt.

Defendant acknowledges that the People proceeded on these three distinct theories of guilt. In his briefs he criticizes but "does not at this point challenge the validity of conspiracy theory in general to establish guilt of a substantive crime. . . ."[11] Rather, he asserts error in (1) the failure to instruct that the existence of a conspiracy must be found beyond a reasonable doubt, and (2) the giving of CALJIC No. 6.20 which, he claims, improperly shifted the burden of proving withdrawal from the conspiracy onto him.

### a. Appropriateness of Uncharged Conspiracy Instructions

■ Although not raised as a separate challenge to the verdicts of guilt, defendant cites law review commentary to "emphasize the illegitimacy" of permitting the prosecution to proceed on an alternate theory of uncharged conspiracy liability. He asserts such is more appropriately reserved for "combatting complex criminal organizations" or "providing a preemptive social defense against a dangerous design prior to the flash point when it becomes an attempt or completed crime." (See Note, *The Conspiracy Dilemma: Prosecution of Group Crime or Protection of Individual Defendants* (1948) 62 Harv. L.Rev. 276, 284-286.)

■ It is long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. (*People* v. *Lopez* (1963) 60 Cal.2d 223, 250 [32 Cal.Rptr. 424, 384 P.2d 16] [uncharged conspiracy to commit burglaries admissible to prove identity of murderer]; *People* v. *Pike* (1962) 58 Cal.2d 70, 88 [22 Cal.Rptr. 664, 372

---

[11] Contrary to defendant's assertion, our review of the record reveals that the prosecutor announced his intention to proceed on an alternate conspiracy theory in his opening statement, and that defense counsel did *not* explicitly object to the prosecutor's election to proceed on such theory or to the standard conspiracy instructions requested and given. Counsel did separately submit his own request for aider-abettor liability instructions, which was denied. (See defendant's argument 11, *post,* at p. 793.)

P.2d 656] [uncharged conspiracy to commit robberies admissible to prove armed robbery culminating in murder].) "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory (*People* v. *Washington* (1969) 71 Cal.2d 1170, 1174 [81 Cal.Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541]; *People* v. *Ditson* (1962) 57 Cal.2d 415, 447 [20 Cal.Rptr. 165, 369 P.2d 714])." (*People* v. *Remiro* (1979) 89 Cal.App.3d 809, 842 [153 Cal.Rptr. 89, 2 A.L.R.4th 1135].)

 The evidence here showed that defendant, Vasquez and Bolanos met, specifically intended to agree or conspire, specifically intended to commit the planned burglary, and carried out overt acts in furtherance of the conspiracy—completing the intended crime. There being evidence supportive of all the elements of a conspiracy, the People were entitled to proceed on that alternative theory of liability. (*People* v. *Horn* (1974) 12 Cal.3d 290, 296 [115 Cal.Rptr. 516, 524 P.2d 1300].)

b. Failure to Instruct on Existence of Uncharged Conspiracy Beyond a Reasonable Doubt

 The jury was charged with nine standardized instructions which fully defined all relevant principles underlying the People's alternative uncharged conspiracy theory of liability.[12] Defendant complains, however, that it was reversible error not to further instruct the jury that the *existence* of a conspiracy at the time of the killing must be proved *beyond a reasonable doubt* as a prerequisite for vicarious liability.[13]

A similar contention was rejected in *People* v. *Jourdain* (1980) 111 Cal.App.3d 396 [168 Cal.Rptr. 702]. Jourdain, like defendant here, argued he was denied due process of law because the standard conspiracy instruc-

---

[12] These included the definition of an uncharged conspiracy and requisite overt act (CALJIC No. 6.10.5), and instructions explaining the nature of joint conspiratorial responsibility (CALJIC No. 6.11); that proof of express agreement was not required (CAJIC 6.12); that evidence of association alone does not prove membership in the conspiracy (CALJIC No. 6.13); that there is no criminal liability for independent acts of coconspirators not in furtherance of the common criminal design (CALJIC Nos. 6.15 and 6.16); that commission of an act in furtherance of a conspiracy does not itself prove membership in the conspiracy (CALJIC No. 6.18); that only an affirmative and bona fide rejection or repudiation of the conspiracy communicated to the coconspirators will effectuate withdrawal from the conspiracy (CALJIC No. 6.20); and that no shared criminal liability attaches to a conspirator's acts committed after termination of the conspiracy (CALJIC No. 6.21).

[13] Although we address the claim on the merits, we note again that defendant failed to proffer a proposed instruction or otherwise object to the standard conspiracy instructions on this ground.

tions permitted the jury to connect him to the illegal uncharged conspiracy and thereby convict him upon a standard lower than "beyond a reasonable doubt."

In rejecting claimed error in the refusal to give defendant's proferred "beyond a reasonable doubt" instruction, the *Jourdain* court reasoned: "That argument misses the point. The People had not charged appellant with, nor were they trying to convict him of, conspiracy. . . . [¶] The admission of [evidence of conspiracy] was not affected by the fact the information had not charged a conspiracy (*People* v. *Morales* ([1968]) 263 Cal.App.2d 368 [69 Cal.Rptr. 402]), and once there had been proof of the existence of the conspiracy there was no error in instructing the jury on the law of conspiracy. (*People* v. *Remiro* (1979) 89 Cal.App.3d 809, 842; *People* v. *Washington* (1969) 71 Cal.2d 1170, 1174.) In so charging the jury the court was not in any way indicating that appellant was being tried for the crime of conspiracy. Rather, the court was merely instructing the jury on the law applicable to the case. (Pen. Code, § 1093.). . . . [¶] . . . There was only one instruction on the burden of proof given to the jury. That instruction told the jury in terms of Penal Code section 1096 that it could not find appellant guilty until his guilt had been proved beyond a reasonable doubt. (CALJIC No. 2.90.)" (*People* v. *Jourdain, supra,* 111 Cal.App.3d at pp. 403-404.)[14]

As instructed, the jury here was not told it could find defendant guilty on an uncharged conspiracy theory upon less than reasonable doubt. CALJIC No. 2.90 was given. Moreover, the jury's verdicts and special findings reflect that they found defendant's guilt of McConnell's murder beyond a reasonable doubt both on actual malice-premeditation and felony-murder-burglary theories.

c. Impermissible Shifting of Burden of Proving Withdrawal From the Conspiracy

■■■ We further reject defendant's argument that instructing the jury in accordance with CALJIC No. 6.20 (that only an affirmative and bona fide rejection or repudiation of the conspiracy communicated to the coconspirators will effectuate withdrawal from the conspiracy) impermissibly

---

[14] Jourdain argued his jury should have been instructed that it must find his *membership in the conspiracy* beyond a reasonable doubt. Here defendant argues the jury should have been instructed it must find *the existence of the conspiracy* beyond a reasonable doubt. For purposes of our analysis these distinctions are not critical. Jourdain's argument was essentially the same as Belmontes's, i.e., that under the standard instructions "the jury could find him guilty of conspiracy upon something less than reasonable doubt." (*Jourdain, supra,* 111 Cal.App.3d at p. 403.)

shifted the burden of proof on such matter to him.　　As we stated in *People* v. *Crosby* (1962) 58 Cal.2d 713, 731 [25 Cal.Rptr. 847, 375 P.2d 839]: "It is not part of the People's prima facie case to negate the possibility of such a withdrawal. Once the defendant's participation in the conspiracy is shown, it will be presumed to continue unless he is able to prove—as a matter of defense—that he effectively withdrew from the conspiracy . . . ."

　Under CALJIC No. 6.20 the burden is upon the defendant to go forward with evidence of his withdrawal from the conspiracy. His burden is one of production—not persuasion beyond a reasonable doubt of his non-membership in the conspiracy. Here, defendant made no attempt whatsoever to suggest how he had affirmatively withdrawn from or repudiated his role in the conspiracy to burglarize McConnell's house, much less communicated the same to Vasquez.[15] Nor under these facts could he readily have done so—*by his own testimony* he felled McConnell with a blow to her head with the iron bar, immediately went about ransacking the rear rooms of her house, ripped out the wires and grabbed a stereo component, then had to urge Vasquez to assist in carrying out the booty as the two fled from the murder scene.

The People properly proceeded on the alternative uncharged conspiracy theory of liability. No prejudice from the giving of the standardized conspiracy instructions is shown.

10.　*Special Findings*

The special findings made by the jury in connection with the verdict of guilt of first degree murder were as follows: (1) "We further find that the murder was wilful, deliberate and premeditated"; (2) "We further find that the murder was intentional"; (3) "We further find that the defendant Fernando Belmontes, Jr., personally committed the killing"; and (4) "We further find that the killing occurred as a result of the commission or attempted commission of the crime of burglary." Two additional special findings were found true in connection with special circumstance: "We further find that the defendant, Fernando Belmontes, Jr., is the actual killer," and "We further find that the defendant, Fernando Belmontes, Jr., in the commission of the special circumstance had the specific intent that death occur."[16]

---

[15] Defendant has conceded that he "fail[ed] to make an affirmative declaration of withdrawal from the conspiracy agreement."

[16] The only special finding left undated and unsigned by the jury foreman was: "We further find that the defendant, Fernando Belmontes, Jr., intentionally aided, abetted, or assisted in the killing itself and in the commission of murder of the first degree."

The Attorney General argues that its rejection "is most reasonable in light of all the other special findings which negate any findings of guilt under the aider and abettor theory." Defendant counters that such inference cannot be drawn because the jury was instructed on a

Defendant argues that these findings were unauthorized "special verdicts" within the meaning of section 1150 and thus violative of his due process rights. We have recently rejected identical arguments and approved the use of "special findings" at the guilt phase such as were made here. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 89-90 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Burgener* (1986) 41 Cal.3d 505, 536-538 [224 Cal.Rptr. 112, 714 P.2d 1251]; *People* v. *Davenport* (1986) 41 Cal.3d 247, 273-275 [221 Cal.Rptr. 794, 710 P.2d 861]; *People* v. *Phillips* (1985) 41 Cal.3d 29, 59 [222 Cal.Rptr. 127, 711 P.2d 423].)[17] Moreover, in contrast to *Burgener,* here the jury was *explicitly* instructed in connection with the special findings that they could only be found true unanimously and beyond a reasonable doubt.

Nor is there any merit to defendant's claim that the special finding of premeditation and deliberation is factually unsupported. Defendant's admitted acts of arming himself with the iron bar, following McConnell to the front door when Bolanos and Vasquez were heard driving up, and striking her in the head with the bar with as much force as he could muster in a "back-handed sweeping motion," alone support the jury's finding of premeditation and deliberation beyond a reasonable doubt. (See *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942].)

Lastly, we reject out of hand defendant's further arguments that the special findings were "unreliable, ambiguous, and meaningless surplusage," and that defense counsel had no "notice of" their "potential legal significance" or "opportunity to contest their factual basis." The charges and special circumstance alleged in the information, as well as the record of proceedings on pretrial motions and the prosecutor's opening statement, all belie these assertions. Defendant's own extrajudicial admissions that he armed himself before entering McConnell's residence, personally felled her with a blow from the iron bar, and completed the burglary and fencing of the stereo, surely put counsel on notice of the independent viability of the People's premeditated-murder *and* felony-murder theories of guilt.

---

conspiracy—not aider-abettor—theory of vicarious liability. In light of the other explicit special findings which were found true, we need place no reliance on the jury's failure to make the special finding on aider-abettor liability in reaching our conclusion that defendant was found to be the actual, intentional killer.

[17] The utility of such special findings may depend upon which or how many special circumstances are charged. For example, where there is "more than one special circumstance . . . charged, but a unanimous finding of guilt on one of them is required before the offense becomes a capital crime, particularized verdicts on each special circumstance are essential." (*People* v. *Davenport, supra,* 41 Cal.3d at pp. 274-275.) We emphasize, however, that section 190.4, subdivision (a), does not *require* "special findings" beyond "what the statutory language calls for: a finding of the *truth* or lack of truth of each circumstance, not the facts upon which the finding is based." (*Id.,* at p. 275; cf. *People* v. *Ghent, supra,* 43 Cal.3d at pp. 762-763 [1977 death penalty law].)

11. *Refusal to Instruct on Lesser-related Offenses and Aider-abettor Liability*

In reliance on our opinion in *People* v. *Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055], defendant contends it was error to refuse his requested instructions on the *lesser-related* offenses of assault with a deadly weapon, battery, and simple theft. Recognizing that we expressly declared the rule in *Geiger* to be prospective only (*id.,* at p. 532, fn. 13), he nevertheless urges "that a narrow exception of retroactivity should be carved for capital appellants." We decline the invitation. We explained in *Geiger* that "the purpose of instructing on related offenses is primarily prophylactic . . . ." (*Ibid.*) Moreover, these facts do not support the possibility that the jury would have convicted defendant of the lesser-related offenses under the refused instructions.

We further reject defendant's claim that it was prejudicial error to refuse his requested instructions on aider-abettor liability. (CALJIC Nos. 3.00-3.02.) The court refused to so instruct the jury because the People had elected to proceed on an uncharged conspiracy theory of vicarious liability. Belmontes's hollow defense would have fared no better under aider-abettor instructions. Under conspiracy law the People had a higher burden of proof; having to establish specific intent to conspire *and* commit the burglary, as well as completion of overt acts in furtherance thereof. Moreover, in order to withdraw from the planned burglary as an aider-abettor, defendant would have had to have notified his accomplices *and further* done everything in his power to prevent commission of the crime. (CALJIC No. 3.02.) In contrast, to withdraw from a conspiracy, one need only make an affirmative repudiation communicated to his coconspirators. (CALJIC No. 6.20.) Defendant proferred no facts suggestive of his "withdrawal" under either theory. In any case, given the evidence and special findings made by the jury, any error in refusing the requested aider-abettor instructions was necessarily harmless.

C. SPECIAL CIRCUMSTANCE ISSUES

1. *Carlos Error*

■ Defendant urges that we strike the special circumstance under authority of *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], wherein we held that intent to kill is an element of the felony-murder special circumstance of the 1978 death penalty law, whether applied to accomplices or to actual killers. (*Id.,* at pp. 153-154.) His contention must be rejected.

The United States Supreme Court has made clear that felony murderers who *personally* killed may properly be subject to the death penalty in conformance with the Eighth Amendment—after proper consideration of aggravating and mitigating circumstances—even where no intent to kill is shown. (*Cabana* v. *Bullock* (1986) 474 U.S. 376, 386-387 [88 L.Ed.2d 704, 716-717, 106 S.Ct. 689, 697]; see *Tison* v. *Arizona* (1987) 481 U.S. 137, 152 [95 L.Ed.2d 127, 141, 107 S.Ct. 1676, 1685].) Subsequently, "[i]n *People* v. *Anderson* [(1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306]], we held that with respect to the actual killer, the court need not instruct on intent to kill in connection with felony-murder special circumstances. Such an instruction is required only when there is evidence from which the jury could find that the defendant was an accomplice rather than the actual killer." (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1193 [240 Cal.Rptr. 666, 743 P.2d 301].)

Here the jury made express findings that defendant *personally* committed an intentional, wilful, deliberate, premeditated murder; that the killing was the result of the commission or attempted commission of the burglary; and that defendant was the *actual killer* and had harbored specific intent to kill. We have rejected the several grounds upon which defendant urges that these special findings were procedurally defective. (*Ante,* at pp. 793-794.) The evidence supports the jury's findings beyond a reasonable doubt that defendant *personally* and *intentionally* killed McConnell—and its rejection of his claim that Vasquez was in the house at the time and "must have" killed her while he (defendant) was busy ransacking the house.[18]

2. *Construing the Felony-murder Special Circumstance as Limited to Premeditated and Deliberate Murders*

■ Defendant urges us to construe the felony-murder special circumstance (§ 190.2, subd. (a)(17)) as limited to *premeditated* and *deliberate* intentional murders. Such was the requirement under the former 1977 death penalty legislation. (*Carlos, supra,* 35 Cal.3d at pp. 138-143.) In *Carlos* we recognized that "[t]he 1978 initiative repealed provisions of the 1977 act requiring physical presence and a wilful, deliberate, and premeditated killing before the jury could find a felony-murder special circumstance." (*Id.,* at p. 143.) The United States Supreme Court has since made it clear

---

[18] In any event, in anticipation of our former *Carlos* holding, the trial court *modified* CALJIC No. 8.80, instructing the jury that: "If the defendant was not the actual killer, it must be proved beyond a reasonable doubt that he intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer *in the killing itself* and in the commission of the murder in the first degree before you are permitted to find the alleged special circumstance of that first degree murder to be true as to Mr. Belmontes." Thus, even had the proposed special findings not been made by the jury—under the modified instruction—defendant was clearly found to have acted with specific intent to kill.

that the Eighth Amendment too does not compel such limitations upon death-qualifying felony murders. (*Cabana* v. *Bullock, supra,* 474 U.S. at pp. 386-387 [88 L.Ed.2d at pp. 716-717, 106 S.Ct. at p. 697]; see *Tison* v. *Arizona, supra,* 481 U.S. at p. 152 [95 L.Ed.2d at p. 141, 107 S.Ct. at p. 1685].)

3. *Corroboration of Accomplice Testimony to Prove Special Circumstance*

Defendant renews his assertion that the only evidence of his intent to kill came from the uncorroborated accomplice testimony of Bolanos. He argues such as a separate ground for reversal of the special circumstance finding.

Section 190.4, subdivision (a), provides in relevant part that: "Wherever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime." We have already rejected defendant's claims that Bolanos's testimony was the sole source of evidence of defendant's intent to kill, and that Bolanos's testimony in this regard went uncorroborated. (*Ante,* at p. 782.) By parity of reasoning we find the instant claim to be without merit. (Cf. *People* v. *McDonald* (1984) 37 Cal.3d 351, 378 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011] [construing § 190.4 in the context of double jeopardy principles]; *People* v. *Mattson* (1984) 37 Cal.3d 85, 93-94 [207 Cal.Rptr. 278, 688 P.2d 887] [construing § 190.4 in the context of the corpus delicti requirement].)

## II. PENALTY PHASE

### A. FACTS

*Evidence in Aggravation*

At the penalty phase the prosecutor introduced evidence of (1) defendant's acquisition of a handgun in early 1979; (2) defendant's carrying the gun for protection during the same time period; (3) his April 1979 conviction as an accessory to voluntary manslaughter; (4) a domestic aggravated assault and battery during the month preceding McConnell's murder; (5) an altercation occurring while defendant was a ward in a county youth facility; and (6) autopsy photographs depicting the nature and extent of McConnell's fatal injuries.

*Acquisition of the Handgun*

In early 1979, William Cartwright managed a motel in Ontario, California, and was casually acquainted with defendant. He testified regarding an occasion when one "Rudy" met defendant at the motel and attempted to sell him a .32 caliber automatic handgun which he had acquired in a burglary. Rudy handed the loaded weapon to defendant and asked if he wanted to buy it. Defendant cocked the trigger, pointed it at Rudy and replied: "I've got it now. Why buy it?" Rudy left the premises and defendant retained the weapon.

*Evidence of Defendant's Carrying the Gun for Protection*

Steven Cartwright testified he was acquainted with defendant in February 1979. He recalled a discussion with defendant who alluded to the fact that some people were "upset" with him. As defendant said this he indicated he had a gun in his belt, slapped his side, and stated he was not concerned as he had all the protection he needed.

*Prior Conviction as an Accessory to Voluntary Manslaughter*

The prosecution and defense stipulated that on April 16, 1979, in San Bernardino County Municipal Court, defendant entered a plea of no contest to a charge of being an accessory after the fact to voluntary manslaughter (§§ 32, 192, subd. (1)), a felony, and was thereafter sentenced after preparation of a probation report.

*Altercation in Youth Facility*

In May 1979, defendant was a ward under the supervision of group counselor Ron Cutler. Cutler testified regarding an incident when defendant was observed swinging a chair and about to hit another ward. Cutler was able to knock the chair out of defendant's hands in mid-air before he could strike the other youth with it.

*Domestic Aggravated Assault and Battery*

In February 1981, defendant, Barbara Murillo (then four months pregnant with defendant's second child), and their two-year-old daughter were living in an apartment in Lodi rented for them by Murillo's parents. Murillo testified for the People regarding an incident that occurred when Bolanos, Cobarrubio, and others were visiting at the apartment. Murillo and defendant got into an argument which escalated into an altercation. Murillo

grabbed a "file" for protection and attempted to phone the police. Defendant cut the telephone cord with his knife. Murillo tried to get out of the apartment. Defendant pushed her and hit her on the head; at one point causing her to drop their infant daughter. He shoved Murillo to the ground and choked her; others present managed to temporarily thwart the attack. Murillo broke out a window and tried to escape through it. Defendant, with the assistance of another male, caught up with and dragged or carried her back into the apartment. A neighbor finally summoned the police who arrived as defendant was leaving the premises.

*Evidence in Mitigation*

Defendant was one month shy of age 20 at the time of McConnell's murder. His mother testified that her marriage to his father was an unhappy one. He was an alcoholic prone to violence and would beat her; breaking her arm on one occasion, stabbing her in another incident. Defendant was 10 years old when the marriage broke up. Mrs. Belmontes remarried; she testified defendant's stepfather was strict and defendant became difficult to control when the second marriage ended after five years. Defendant had not lived with his mother since being committed to the California Youth Authority in 1979. At the time of trial defendant had a younger brother and sister. Ms. Belmontes characterized defendant's relationship with his sister as "very close."

Defendant's grandfather testified that he and his wife were close to defendant, who attended his grandmother's funeral in 1978. He confirmed that defendant's natural father drank to excess and beat his daughter (defendant's mother). The grandfather had no contact with defendant after his release from the Youth Authority.

Robert Martinez, age 24, testified on defendant's behalf. They were close friends during their early teens and usually spent their time working on Martinez's "low rider" automobile, smoking marijuana and drinking beer, and "hanging around" a car club. Defendant was "best man" at Martinez's wedding. Martinez felt defendant was not a violent person. He and his wife had no contact with defendant after his one visit with them shortly after his release from the Youth Authority.

Martinez's wife Darlene testified she considered defendant a close friend. She was a born-again Christian; when defendant visited with them after his release from the Youth Authority he had advised her that he too was a born-again Christian. He also mentioned his struggling relationship with Murillo and expressed concern that she was not a Christian.

Reverend Dale Barrett, chaplain at the California Youth Authority's Pine Grove Facility, knew defendant from his participation in the "M-2" program, under which a member-family of a local church would be matched with a ward, who in turn would be permitted to visit with the family at specified times. Defendant was matched with Beverly and Fred Haro and participated in the program for about a year. Defendant was baptized during his stay in the Youth Authority. Reverend Barrett felt that unlike the many wards who stayed in the program only to get out of camp and manipulate favors from the sponsoring families, defendant had not "conned" them. He testified that although he personally believed in the death penalty as a deterrent to premeditated murders, he did not feel defendant deserved to die because he was a salvageable person with extenuating circumstances in his life. Although his knowledge of defendant's crimes was concededly limited, it was his understanding that they had not been conclusively determined as premeditated.

The Haros testified they were members of Reverend Barrett's church. Through participation in the "M-2" program defendant had spent Wednesday evenings and weekends with them over a period of time. The Haros also sponsored other wards whom they treated as their own sons. They felt they had a good relationship with defendant, who on occasion had attended church with them. They felt defendant had been a good influence on their own teenage son. Fred Haro testified he was "strongly for the death penalty" but believed defendant was innocent of the charges and thus did not deserve to die. Beverly Haro felt Barbara Murillo was the primary negative factor in defendant's life.

Don Miller, assistant chaplain at the Youth Authority's Preston Facility and director of the "M-2" program, helped place defendant in a halfway house in Oakland upon his release from the Youth Authority. He was aware that defendant stayed in that facility only two weeks before moving to the Lodi area to take a job with the forest service. Defendant returned to Preston on a few occasions after his release and spoke to wards about what life was like "on the outside." Reverend Miller believed defendant would be good at talking with other prisoners if he were committed to prison for a life term.

Defendant testified in his own behalf. He had a poor relationship with his father who would come home drunk and hit his mother. He did not like school and stopped attending in the ninth grade. Although his youth was "pretty hard," defendant twice stressed he did not want to "use it as a crutch."

Defendant was in the custody of the Youth Authority from early 1979 through his release in November 1980. He worked on the fire crew at the

Pine Grove Camp for one year. He admitted he initially entered the "M-2" program as a way to get out of camp. Thereafter, he studied the Bible with the Haros and in time started serving the Lord. He was paroled from the Youth Authority after serving his maximum sentence. He stayed at the halfway house in Oakland for two weeks and then went to Southern California for a short period, returning with Murillo to the Lodi area to take a job with the forest service. Things did not go well for defendant while he was living with Murillo. He "couldn't deal with" his religious commitment and "started going back to [his] old ways," in part due to "pressure on the streets." At the time of trial, defendant had not abandoned his religious beliefs but felt he was no longer "dedicated one hundred percent" to his religious commitment.

At the conclusion of the evidentiary stage, the court permitted defendant to personally address the jury in his own behalf during closing arguments.

B. PENALTY PHASE ISSUES

1. *Use of Peremptory Challenges to Exclude Prospective Jurors Expressing Reservations About the Death Penalty*

Defendant contends that the prosecutor improperly exercised peremptory challenges to excuse four prospective jurors who—although not excusable for cause under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]—nevertheless expressed some reservations about the death penalty. We have rejected the argument in *People* v. *Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669], wherein we found "no . . . constitutional infirmity in permitting peremptory challenges by both sides on the basis of specific juror attitudes on the death penalty." (*Id.,* at p. 315.)

2. *Instructions on Sympathy and General Character and Background Evidence*

■ Defendant argues that the jury was misinstructed on the proper role of sympathy and general character and background evidence in the penalty phase.

In *People* v. *Melton* (1988) 44 Cal.3d 713, 759 [244 Cal.Rptr. 867, 750 P.2d 741], we explained: "We previously reversed several death judgments where (1) a 'no-sympathy' instruction was given *at the penalty phase,* (2) the jury also received, without elaboration, an instruction (the 'unadorned factor (k) instruction') to consider mitigating evidence which 'extenuates the *gravity of the [capital] crime*' (§ 190.3, subd. (k); former § 190.3, subd. (j); CALJIC, former No. 8.84.1, subd. (k), italics added), and (3) defendant

introduced substantial evidence about his *general character and background*. In such cases, we reasoned, there was intolerable ambiguity about whether the jury understood its power and duty under the Eighth Amendment to consider *all* 'sympathetic' evidence defendant proffered on behalf of a penalty less than death. (E.g., *People* v. *Brown* (1985) 40 Cal.3d 512, 537-538 [220 Cal.Rptr. 637, 709 P.2d 440]; *People* v. *Lanphear* (1984) 36 Cal.3d 163, 166-169 [203 Cal.Rptr. 122, 680 P.2d 1081]; *People* v. *Easley* (1983) 34 Cal.3d 858, 878-879 [196 Cal.Rptr. 309, 671 P.2d 813]; see *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 117 [71 L.Ed.2d 1, 12, 102 S.Ct. 869], and conc. opn. of O'Connor, J., at p. 119.)[19]

"The United States Supreme Court granted certiorari in *People* v. *Brown, supra,* 40 Cal.3d 512, to consider the constitutional effect of a 'no-sympathy' admonition on penalty deliberations in a capital case. The court has concluded that a warning to ignore 'mere' sympathy does not offend the Eighth Amendment in and of itself. However, where the jury was cautioned against sympathy and also received an unadorned factor (k) instruction, the penalty-phase instructions and arguments must be examined as a whole to determine whether the jury was 'adequately informed . . . of its responsibility to consider all of the mitigating evidence introduced by the [defendant] . . . .' (*California* v. *Brown* (1987) 479 U.S. 538, 546 [93 L.Ed.2d 934, 943, 107 S.Ct. 837] [conc. opn. of O'Connor, J.].)"

We conclude the jury here was adequately informed of the full nature of its responsibility to consider sympathy and general character and background evidence.

First, the standardized "no-sympathy" instruction was not given in this case. At the People's request, a modified version of CALJIC No. 1.00 was given. The words "sympathy" and "passion" were omitted from the first sentence of the instruction, which as modified read: "You are instructed that as jurors you must not be swayed by mere sentiment, conjecture, [ ] . . . prejudice, public opinion, or public feeling." (Contrast CALJIC No. 1.00.) The following charge was then read after the first modified sentence: "Also, you must not be influenced by sympathy or passion except as those feelings properly arise out of your consideration of the proven factors in aggravation and mitigation." Thus the trial judge and prosecutor here presciently fashioned an instruction which satisfies the directives announced by

---

[19] In a footnote we explained: "CALJIC No. 8.84.1 has since been revised to make clear, as we directed in *Easley,* that mitigating evidence to be considered under 'factor (k)' includes 'any . . . "aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.". . .' (P. 878, fn. 10; see CALJIC No. 8.84.1, subd. (k) (4th ed. 1984 rev.).)"

the United States Supreme Court nearly five years later in *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].[20]

Next, although the jury did receive an instruction in the literal terms of factor (k), it was also instructed that only *statutory* aggravating factors could be properly considered (§ 190.3), immediately followed by a special instruction which stated: "the mitigating circumstances which I have read for your consideration are given to you *merely as examples* of some of the factors that you may take into account as reasons for deciding not to impose a death sentence upon Mr. Belmontes. You should pay careful attention to each of these factors. Any one of them, standing alone, may support a decision that death is not the appropriate punishment in this case [italics added]."

The prosecutor's argument reinforces our conclusion that, as instructed, the jury must have fully understood its obligation to weigh all of defendant's mitigating evidence. He told the jurors: "With respect to the instructions . . . in this listing of aggravating and mitigating circumstances which you are to weigh one against the other, there is a proper place for sympathy and passion. [¶] . . . At this stage of the proceedings you are not only the judges of the facts, you decide how much they weigh. And in weighing them, it is proper to take into account factors that impinge upon anger and sympathy and so forth." He went on to explain: "Let me tell you what that doesn't mean, if I may. Your regard for Steacy McConnell's family, mean no one [*sic*], no one can deny sympathy for them, no one. But that is not the kind of sympathy the instruction tells you to consider. It says as sympathy or passion naturally arises or properly arises from the factors in aggravation and mitigation. . . . [¶] . . . it is different from the guilt phase when sympathy was to play no part at all."

In discussing the scope of "factor (k)" evidence in his argument, the prosecutor did at first express some doubt as to whether evidence of defendant's prior religious experience "really fits in there." However, he quickly concluded: "I think it appears to be a proper subject of consideration." He then argued his position that defendant's religious experience *prior to the murder* was not a strong mitigating factor under all the circumstances. He suggested the jury should "weigh" defendant's "religious awakening" as "a

---

[20] Defendant contends that the modified instruction was itself incorrect and misleading because sympathy for the defendant cannot "properly arise" out of an aggravating factor. In so arguing, however, he interprets the proper role of "sympathy" at the penalty phase too narrowly. The United States Supreme Court has implicitly recognized that a penalty phase juror need not "ignore emotional responses" which are "rooted in the aggravating and mitigating evidence introduced during the penalty phase." (*California* v. *Brown* (1987) 479 U.S. 538, 542 [93 L.Ed.2d 934, 940, 107 S.Ct. 837].)

basis for determining penalty," particularly in the context of Reverend Miller's opinion that, if given a life term, defendant would be good at talking and working with other prisoners. The prosecutor concluded in this vein: "I think that value to the community is something that you have to weigh in. There's something to that."

Finally, in summing up all the penalty phase evidence, the prosecutor candidly stated: "The prior criminal activity has been described to you on the stand isn't great, you know. [¶] All right. So these things, they really, they don't show that the defendant is such a horrible person that the ultimate penalty must be imposed." The prosecutor went so far as to suggest that the aggravating factors—other than those circumstances directly related to the murder—came to a "draw." The thrust of his penalty phase argument was that the aggravated circumstances of the crime itself were the major factors outweighing the mitigating evidence and militating in favor of the death penalty.

Viewing the instructions and arguments as a whole, we conclude there exists "no legitimate basis" for believing the jury was misled regarding its sentencing responsibilities. (*California* v. *Brown, supra,* 479 U.S. at p. 546 [93 L.Ed.2d at p. 943, 107 S.Ct. at p. 842] [conc. opn. of O'Connor, J.].)

### 3. *"Mandatory" Nature of 1978 Death Penalty Law*

■■■ Defendant attacks the instruction which charged the jury that it "shall" impose death if it finds that aggravating "outweigh" mitigating circumstances. (CALJIC, former No. 8.84.2; see § 190.3.)

We recently summarized the relevant principles in *People* v. *Gates, supra,* 43 Cal.3d at pages 1203-1204 as follows: "In *People* v. *Brown* (1985) 40 Cal.3d 512, 538-545 (revd. on other grounds *California* v. *Brown* (1987) U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), we concluded that the directive of section 190.3 that the trier of fact 'shall impose a sentence of death' if it 'concluded that the aggravating circumstances outweigh the mitigating circumstances,' did not impermissibly restrict the jury's constitutional sentencing discretion. We rejected the defendant's proffered mechanistic construction of the words 'outweigh' and 'shall' in favor of one which directed the jury to weigh the various factors and determine under the relevant evidence which penalty is appropriate in a particular case. We noted, however, that the statutory language—particularly the words 'shall impose'—left room for some confusion about the jury's role and therefore directed courts in the future to instruct on the scope of the jury's discretion. We further stated that each prior case 'must be examined on its own merits to determine whether, in context, the sentencer may have been misled to defendant's

prejudice about the scope of its sentencing discretion under the 1978 law.' (*Id.,* at p. 544, fn. 17.)

"Our concerns in *Brown* were essentially two: The first was that the jury might be confused about the nature of the weighing process, that it is not a mere mechanical counting of factors on each side of an imaginary scale but rather a mental balancing process. Our second concern was that use of the word 'shall' might mislead the jury as to the substance of the ultimate determination it was called upon to make. In *Brown,* we concluded that the statutory language 'should not be understood to require any juror to vote for the death penalty unless, upon completion of the "weighing" process, he decides that death is the appropriate penalty under all the circumstances. Thus the jury, by weighing the various factors, simply determines under the relevant evidence which penalty is appropriate in the particular case.' (40 Cal.3d at p. 541.)" (See also *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1277 [232 Cal.Rptr. 849, 729 P.2d 115].)

We have examined the instructions and arguments in this regard and determine that, overall, the jury was adequately informed of the full nature of its sentencing responsibility. (*People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.) While it heard the "shall/outweigh" instruction, the jury also received additional instructions further defining its proper sentencing function. It was told that aggravating factors were strictly limited by statute and must be proved beyond a reasonable doubt. As already noted, it was further told that the mitigating factors enumerated in the statute were merely "examples" of mitigating circumstances which could be considered, and that any one mitigating circumstance *standing alone* could support a decision that death is not the appropriate penalty in this case.

Regarding counsel's arguments, here, as in *Allen,* "the prosecutor not once suggested the weighing process was a mechanical function. Indeed, he effectively told the jury just the opposite, and attempted to give guidelines that could be applied by each individual juror to first value and then weigh the respective factors." (*People* v. *Allen, supra,* 42 Cal.3d at p. 1277.) He told the jury they must "weigh" aggravating against mitigating cirumstances in determining penalty, and explained: "[Y]ou decide how much they weigh." He used the terms "weigh," "simple weighing," and "balance" several times in his discussions of each of the individual aggravating and mitigating circumstances. He urged the jury to assess defendant's prior religious experience and attempt to determine "how much does that weigh." He stated that defendant's potential value to the community or prison population should he be sentenced to life imprisonment was "something you have to weigh in." He stressed to the jurors that defendant's

obvious intelligence was "a factor to be weighed," as was any lingering doubt about his guilt of McConnell's murder.

As already noted, the prosecutor suggested that the aggravating circumstances—exclusive of those directly related to the brutal murder—did not in and of themselves warrant the death penalty. Our review of the instructions and arguments as a whole compels rejection of defendant's assertion that the giving of the "shall/weigh" instruction "misled the jury into abandoning its role as conscience of the community and assuming a role more akin to that of a penological account," "governed by the type of 'arithmetical formula' condemned in [*Brown, supra*, 40 Cal.3d 512]."

Lastly, defendant refers us specifically to one juror's (Juror Hearn's) inquiry about "the listing" of aggravating and mitigating circumstances. She asked, "That was the listing, right?" and then inquired: "Of those certain factors we were to decide one or the other and then balance the sheet?" The court responded: "That is right. It is a balancing process."

At oral argument, appellate counsel asserted that these inquiries reflect that "Mrs. Hearn was seeking judicial confirmation of her restrictive view of the scope of factors which should go into the penalty phase deliberations." We cannot agree with counsel's conclusion that the juror's mere reference to the statutory "listing" of aggravating and mitigating factors—as a predicate to her question about the balancing process—reflected her "restrictive" view of factor (k) evidence. Nor can we agree that "the court compounded the error in its response, 'That was the listing, yes.'" Counsel suggests that the "constitutionally correct" answer would have been: "That list is exhausting [*sic*] as to aggravating factors, but it is only illustrative as to mitigating factors." That is precisely what the court's modified instructions on mitigating evidence conveyed. (*Ante,* at pp. 800-801.)

Defendant also infers from Juror Hearn's use of the term "balance the sheet" in her inquiry that she was following the type of "arithmetical formula" which this court condemned in *Brown, supra,* 40 Cal.3d 512. But viewed in the overall context of the instructions and arguments, neither the juror's question nor the court's response supports an inference of reversible *Brown* error. Defendant misreads our statement in *Brown*—to the effect that in weighing mitigating against aggravating circumstances "the balance is not between good and bad but between life and death" (*id.* at p. 542, fn. 13)—as a blanket condemnation of use of the term "balancing" to describe the "weighing" process. Elsewhere in *Brown* we characterized the term "weighing" as "connot[ing] a mental balancing process. . . ." (*Id.,* at p. 541.) There is nothing inherently misleading in use of the term "balancing" to describe the weighing process—where the instructions and argu-

ments taken as a whole fully and properly define the scope and nature of the jury's sentencing responsibilities.[21]

### 4. *Requiring Appropriateness of Death Penalty to Be Shown Beyond a Reasonable Doubt*

Defendant asserts that the 1978 death penalty law is unconstitutional in that it fails to require the jury to find *beyond a reasonable doubt* (1) that the aggravating factors outweigh those in mitigation, and (2) that death is the appropriate penalty. We have recently rejected these identical arguments. (*People* v. *Melton, supra,* 44 Cal.3d at pp. 762-763; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Allen, supra,* 42 Cal.3d at p. 1285.)

### 5. *Specific Findings on Aggravating and Mitigating Circumstances at the Penalty Phase*

■ Defendant argues that the court erred in denying defense counsel's request that the jury be required to make specific findings regarding any aggravating or mitigating factors found to be true. We have recently rejected this argument; written findings disclosing the precise reasons for the jury's penalty verdict are not required. (*People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779; *People* v. *Allen, supra,* 42 Cal.3d at p. 1285; cf. *People* v. *Frierson* (1979) 25 Cal.3d 142, 178-180 [158 Cal.Rptr. 281, 599 P.2d 587] [1977 death penalty law]; *Harris* v. *Pulley* (9th Cir. 1982) 692 F.2d 1189, 1195-1196, vacated and remanded on other grounds, *Pulley* v. *Harris* (1984) 465 U.S. 37 [79 L.Ed.2d 29, 104 S.Ct. 871].)

### 6. *Age as an Aggravating Factor*

One of the factors to be considered by the penalty phase jury "if relevant" is "[t]he age of the defendant at the time of the crime." (§ 190.3, factor (i).) ■ The prosecutor here told the jury it was for them to determine whether defendant's age was a factor in aggravation or mitigation. He went on to argue: "The defendant may well say I was only 19 when this happened or the attorney may say he was only 19 and when you're young you sometimes you make mistakes, mistakes that you would never make if you were 29 or 39. And that sort of thing must be taken into account. When you are young, your judgment isn't right or isn't mature or developed. [¶] On the other hand, however, it's common experience that when you're young peo-

---

[21] The verb "balance" is defined thusly: "1. To weigh in a balance; to estimate the weight of; to ponder; 2. To weigh (two things) by each other; to compare in relative force, importance, value, etc. . . . ." (Webster's New Internat. Dict. (2d ed. 1936) at p. 206.)

ple are idealistic, altruistic, they believe that anything is possible, that people love one another or that everything is good or all is good for them and that as they age, a cynicism creeps in. Maybe that's too strong a word. A hardening, maybe. And that it doesn't always necessarily mean that you're a better person when you get older. [¶] Going the other way around, it doesn't mean you're a better person when you're younger, either. [¶] All I'm saying is that I think the age of the defendant goes both ways, really." In further commenting on defendant's own testimony that he was not relying on his difficult childhood to justify his criminal acts, the prosecutor stated: "But he's old enough that he has to take responsibility for his own actions, and he told you that. He can't use that as a crutch. I give him credit for recognizing that."

Defendant asserts that this was improper argument on age as an aggravating factor. Initially, we note that defendant failed to object to the prosecutor's comments or to request an appropriate admonition. Accordingly, to the extent he is arguing "misconduct," he has waived the objection on this ground on appeal. (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 788; *People* v. *Allen, supra,* 42 Cal.3d at pp. 1283-1284; *People* v. *Green, supra,* 27 Cal.3d at p. 27.)

■ We recently stated that "mere chronological age, a factor over which one can exercise no control, should not of itself be deemed an *aggravating* factor." (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 789.) On the other hand, "mere chronological age of itself should not be deemed a mitigating factor. Age alone is plainly 'a factor over which one can exercise no control.' (*Rodriguez, supra,* at p. 789) . . . . [¶] In our view, the word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (*People* v. *Lucky* (1988) 45 Cal.3d 259, 302.)

■ Here the prosecutor in essence argued that defendant's age was a "neutral" factor: "All I'm saying is that I think the age of the defendant goes both ways, really." He did not declare affirmatively that defendant's "mere chronological age" of almost 20 years weighed in favor of the death penalty. (*Rodriguez, supra,* 42 Cal.3d at p. 789.) He remarked that defendant was "old enough that he has to take responsibility for his own actions." Such comment "reasonably may be viewed as merely arguing the inapplicability of a mitigating factor, rather than seeking to penalize defendant by reason of his age." (*People* v. *Ghent, supra,* 43 Cal.3d at p. 775.)

### 7. *Lack of Remorse as an Aggravating Factor*

■ Defendant contends that the prosecutor impermissibly argued lack of remorse as an aggravating factor. The prosecutor told the jury: "[Defendant] can't suggest to you he feels remorse, because ladies and gentlemen of the jury, that is the one thing that we have never heard, that he is sorry. As a matter of fact, the only emotion, the only genuine emotion that I saw, and I think you saw, came during his cross-examination on the guilt phase when he expressed anger at Domingo Vasquez for standing and staring in shock instead of picking up the stereo. So there is no remorse. No thought of Steacy."

■ It is clear that the People may not present evidence in aggravation unless it is relevant to an aggravating circumstance expressly listed in section 190.3 (*People* v. *Boyd* (1985) 38 Cal.3d 762, 771-776 [215 Cal.Rptr. 1, 700 P.2d 782].)

Defendant failed to object to the prosecutor's comments on remorse. Nor did he request a curative admonition. To the extent he is claiming it was "misconduct" to affirmatively argue lack of remorse as an aggravating factor, he has waived the objection on appeal. (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 788; *People* v. *Allen, supra,* 42 Cal.3d at pp. 1283-1284; *People* v. *Green, supra,* 27 Cal.3d at p. 27.)

■ "[W]e have held that, under a prior death penalty law, the presence or absence of remorse is a factor relevant to the jury's penalty decision. (*People* v. *Coleman* [(1969)] 71 Cal.2d [1159,] at p. 1168 [80 Cal.Rptr. 920, 459 P.2d 248].) The concept of remorse for past offenses as a mitigating factor sometimes warranting less severe punishment or condemnation is universal." (*People* v. *Ghent, supra,* 43 Cal.3d at p. 771.)

■ Although in *Davenport* we held that "in the future" prosecutors should refrain from arguing the mere absence of a mitigating factor as itself constituting an aggravating circumstance (41 Cal.3d at p. 289), here the prosecutor's reference to defendant's lack of remorse, "as in his comments on age . . . did no more than suggest the *inapplicability* of a *mitigating* factor." (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 790; *People* v. *Ghent, supra,* 43 Cal.3d at p. 771.) It was part-and-parcel of his overall argument that each category of defendant's penalty phase evidence (e.g., defendant's "religious beliefs" within the "catchall provision" of factor (k)) was worthy of assignment of only marginal mitigating "weight."

Lastly, even were we to read the prosecutor's closing argument as affirmatively advancing defendant's lack of remorse as an aggravating cir-

cumstance, our review of the record convinces us that such remarks could not have affected the jury's penalty verdict. (*People* v. *Ghent, supra,* 43 Cal.3d at pp. 775-776.)

### 8. *Evidence of Other Criminal Conduct*

■■■ Defendant argues that the admission of prior *unadjudicated* criminal conduct at the penalty phase violated his state and federal due process rights. The claim lacks merit. Section 190.3 constitutionally permits introduction at the penalty phase of evidence of prior unadjudicated criminal conduct as relevant to and bearing upon the character and record of the individual offender. "As the plurality opinion in *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978], emphasized: ' . . . [I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment [citation] *requires consideration of the character and record of the individual offender* and the circumstances of the particular offense *as a constitutionally indispensable part of the process of inflicting the penalty of death.*' (Italics added.)" (*People* v. *Robertson* (1982) 33 Cal.3d 21, 58 [188 Cal.Rptr. 77, 655 P.2d 279], first italics added; see *Eddings* v. *Oklahoma, supra,* 455 U.S. 104, 111-112 [71 L.Ed.2d 1, 8-9]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604-605 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954] (plur. opn.); *People* v. *Brown, supra,* 40 Cal.3d at p. 539.)

■■■ Defendant further contends that none of his prior instances of unadjudicated criminal conduct constituted a cognizable criminal offense involving force or violence.

■■■ Insofar as section 190.3 contemplates consideration of defendant's criminal history (see factors (b), (c)), such evidence "must be limited to . . . conduct that demonstrates the commission of an actual crime, specifically, the violation of a penal statute. . . ." (*People* v. *Phillips,* (1985) 41 Cal.3d 29, 72; see also *Boyd, supra,* 38 Cal.3d at pp. 776-778.) We have also made clear the distinction between "criminal activity" and "convictions" for purposes of section 190.3. "The plain meaning of [factors] (b) and (c) of section 190.3 is that the jury must consider any *violent* criminal activity by the defendant, *whether or not it led to prosecution and conviction* [fn. omitted], *and* any 'prior *felony conviction*' (italics added), whether the underlying offense was violent or nonviolent. (See . . . *Boyd* (1985) 38 Cal.3d 762, 774, 776.) . . . ." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 201 [222 Cal.Rptr. 184, 711 P.2d 480], second italics added.)

■■■ The prosecutor was entitled to present testimonial evidence of violent "criminal activity" with which defendant had never been charged. (*Balderas, supra,* 41 Cal.3d at pp. 201, 205; see also *People* v. *Robertson,*

*supra,* 33 Cal.3d at p. 53.) Defendant's domestic altercation with Murillo; his pointing a loaded gun at "Rudy" in order to appropriate the weapon; and his apparently unprovoked act of swinging a chair at another ward at a youth facility, were all violent criminal offenses (aggravated assault, battery, assault with a deadly weapon, and simple assault) and thus properly argued as aggravating circumstances.

■■■ It was error, however, to admit evidence that defendant, while in the presence of an acquaintance, once slapped his side indicating he had a handgun in his waistband, while stating he had "all the protection he needed." Although such is arguably an "express or implied threat to use force or violence" (§ 190.3), it was not directed at a particular victim or victims, and did not amount to criminal conduct in violation of a penal statute. (*People* v. *Phillips, supra,* 41 Cal.3d at p. 72.) The Attorney General concedes as much.

We find the error nonprejudicial. This case was tried before *Phillips, supra,* 41 Cal.3d 29, and *Balderas, supra,* 41 Cal.3d 144, were decided. The jury was instructed on the requirement that "other crimes" be proved beyond a reasonable doubt. (*People* v. *Robertson, supra,* 33 Cal.3d at p. 55.) The properly admitted aggravating evidence in this case—in particular, the circumstances of the crime (§ 190.3, factor (a))—was simply overwhelming. It would require capricious speculation for us to conclude that the erroneous admission of evidence of the "gun slapping" incident affected the penalty verdict.

Lastly, defendant argues that evidence of his 1979 felony conviction upon a plea of "no contest" to being an accessory to voluntary manslaughter should have been excluded. He asserts that such a plea "demonstrates only that a defendant is willing to accept the punishment prescribed for a particular offense," and "does not establish the truth of the facts implied or contained in the charge." The claim is specious. Section 1016 provides, in pertinent part, that: "The legal effect of [a nolo contendere] plea, to a crime punishable as a felony, shall be the same as that of a plea of guilty for all purposes." Moreover, defendant *stipulated* to introduction of this evidence. Evidence of the prior felony conviction was properly admitted. (§ 190.3, factor (c).)

## 9. *Juror Misconduct*

■■■ During a break in the penalty phase, defense counsel advised the court that he had observed a juror, Mr. Meyers, talking to Mr. McConnell, a member of the victim's family. Counsel had also seen one of the four alternate jurors, Ms. Romans, conversing with the victim's grandmother.

A hearing was conducted in chambers on the matter. Juror Meyers explained that he was "discussing motorcycles" with Mr. McConnell. The conversation was "purely social;" nothing had been said about defendant or the trial proceedings. Defense counsel asked Meyers: "[D]o you think there is anything about the fact that you have had a chance to be exposed to Mr. McConnell in this social vein or whatever you would have some rapport or feeling with him that would prejudice or be a concern to me or Mr. Belmontes?" Meyers responded, "No." He expressed a clear understanding of the court's concerns. When asked, "Supposing you were to make a decision he [Mr. McConnell] didn't agree with, mainly life in prison, do you feel you could look him in the eye?" Meyers responded, "Sure." He then apologized for causing a problem.

Alternate Juror Romans was similarly questioned. She revealed she had talked briefly with the victim's grandmother, who was hard of hearing, on a "personal" level; "just wondering how she was, you know, holding up or something like that." Since Romans ultimately never sat on defendant's jury, there is no concern that her contact was prejudicial.

The prosecutor informed the court that he had instructed the members of the victim's family "not to talk to the prospective jurors, although that was some time ago." He advised the court that he would do so again. The court denied counsel's motion for a mistrial, stating on the record that having made the relevant inquiries it found "no taint." Back in the full jury's presence, the court admonished the jurors not to talk to any members of the victim's family, adding: "And I would admonish the McConnell family and the Steacy family also, please, whether you want to talk about the stars or the tulips or the roses, I don't even want you to do that."

Defendant argues that a mistrial should have been granted—or in the alternative—Juror Meyers replaced with an alternate juror other than Ms. Romans. ▮▮▮ We have held that jury misconduct raises a presumption of prejudice; unless the prosecution rebuts that presumption by proof that no prejudice actually resulted, the defendant is entitled to a new trial. (*People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91]; *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050].) ▮▮▮ Our review of the record satisfies us that the presumption was rebutted and no prejudice actually resulted.

10. *Admissibility of Codefendants' Plea Dispositions as Mitigating Evidence*

▮▮▮ Defendant argues that the trial court erred in excluding evidence of the pleas and negotiated dispositions of his accomplices at the penalty

phase.[22] We disagree. Evidence of Bolanos's and Vasquez's negotiated plea dispositions—*separate and apart from evidence of their complicity and degree of involvement in the instant offenses*—bore no relevance to the jury's properly guided function at the penalty phase. " '[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of *the character and record of the individual offender* and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death (italics added).' " (*Lockett* v. *Ohio, supra,* 438 U.S. at p. 604 [57 L.Ed.2d at p. 989.], quoting *Woodson, supra,* 428 U.S. 280.)

The United States Supreme Court in *Lockett* stated: "We recognize that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes. The considerations that account for the wide acceptance of individualization of sentences in noncapital cases surely cannot be thought less important in capital cases. Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. *The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases.* A variety of flexible techniques—probation, parole, work furloughs, to name a few—and various post-conviction remedies may be available to modify an initial sentence of confinement in noncapital cases. The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence [fn. omitted, italics added]." (*Lockett* v. *Ohio, supra,* 438 U.S. at pp. 604-605 [57 L.Ed.2d at p. 990], italics added; see *People* v. *Allen, supra,* 42 Cal.3d at pp. 1286-1287.)

In *Coulter* v. *State* (Ala.Crim.App.1982) 438 So.2d 336, 345-346, the Alabama Court of Criminal Appeals, "[a]pplying the principles of *Lockett,* in light of *Eddings* [*Eddings* v. *Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869]] and *Enmund* [*Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368]] . . .," reasoned that "an alleged accomplice's sentence is a product of the aggravating and mitigating circumstances applicable to the alleged accomplice. *In the sentencing phase of the trial, the fact that an alleged accomplice did not receive the death*

---

[22] The jury of course learned at the guilt phase—for purposes of impeachment of Bolanos—that he had pled guilty to second degree burglary and was granted immunity from prosecution for McConnell's murder in exchange for his testimony at defendant's trial. Evidence of Vasquez's guilty plea to second degree murder was not admitted at the guilt phase. (*Ante,* fn. 9, at p. 779.)

*penalty is no more relevant as a mitigating factor for the defendant than the fact that an alleged accomplice did receive the death penalty would be as an aggravating circumstance against him. Simply put, an alleged accomplice's sentence has no bearing on the defendant's character or record and it is not a circumstance of the offense* (italics added)." (See also *Brogie* v. *State* (Okla. Crim. 1985) 695 P.2d 538, 546-547 [relying on *Coulter*].)

In *State* v. *Williams* (1982) 305 N.C. 656 [292 S.E.2d 243], certiorari denied 459 U.S. 1056 [74 L.Ed.2d 622, 103 S.Ct. 474], defendant argued that the trial court had erred in refusing to submit to the jury as a circumstance in mitigation evidence that his two accomplices had negotiated plea bargains with maximum ten-year prison terms. In rejecting the contention, the North Carolina Supreme Court wrote: "The fact that the defendant's accomplices received a lesser sentence is not an extenuating circumstance. It does not reduce the moral culpability of the killing nor make it less deserving of the penalty of death than other first-degree murders. [Citation.] The accomplices' punishment is not an aspect of the defendant's character or record nor a mitigating circumstance of the particular offense. (See *Lockett* v. *Ohio* [, *supra,*] 438 U.S. 586.) It bears no relevance to these factors, and thus there was no error in the judge's refusal to submit it to the jury." (*Id.,* at pp. 261-262.)

The Fifth Circuit Court of Appeals has likewise rejected the identical contention, concluding that nothing in the United States Supreme Court's recent decision in *Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669], or *Hitchcock* v. *Dugger* (1987) 481 U.S. 393 [95 L.Ed.2d 347, 107 S.Ct. 1821], lends any support to the argument that a codefendant's sentence disposition is relevant to a capital defendant's character, record, or the circumstances of his offense, as *relevancy* is defined in *Lockett, supra,* 438 U.S. 586. (*Brodgon* v. *Butler* (5th Cir. 1987) 824 F.2d 338, 343; *Brogdon* v. *Blackburn* (5th Cir. 1986) 790 F.2d 1164, 1169.)

Although we recognize that several Florida decisions have reached a contrary conclusion (see, e.g., *Brookings* v. *State* (Fla. 1986) 495 So.2d 135, 143; *Messer* v. *State* (Fla. 1976) 330 So.2d 137, 141-142), we find the rationale of *Coulter* v. *State, supra,* 438 So.2d 336, *State* v. *Williams supra,* 292 S.E.2d 243, and the *Brogdon* decisions persuasive and conclude that their holdings should be applied here. ▄▄▄ At the guilt phase, defendant's jury was fully apprised of the roles and degree of participation Bolanos and Vasquez each had in the burglary and murder. The jury's verdicts and special findings, supported by the weight of evidence, establish that defendant was found beyond a reasonable doubt to have personally, intentionally killed McConnell prior to Vasquez's entry into the victim's house. Bolanos never entered the house. As a factual matter, defendant's accomplices clear-

ly did not share his level of involvement and participation in the murder. On these facts, the holdings of *Woodson, supra,* 428 U.S. 280, *Lockett, supra,* 438 U.S. 586, *Eddings, supra,* 455 U.S. 104, and *Enmund, supra,* 458 U.S. 782 compel the conclusion that Bolanos's and Vasquez's *individually negotiated dispositions* were not "constitutionally relevant" to defendant's penalty determination. (See *People* v. *Allen, supra,* 42 Cal.3d at p. 1287; *People* v. *Brown, supra,* 40 Cal.3d at p. 540.)

### 11. *Juror Inquiries During Penalty Phase Deliberations*

After less than three hours of deliberation, the jury foreman presented the court with a note inquiring (1) "what happens if we can't agree?" (2) "can the majority rule on life imprisonment?" and (3) "how long do we deliberate today and what happens if we don't reach a decision by then?" The court responded by rereading CALJIC No. 8.84.2—as modified at defense counsel's request—which in essence told the jury they had to choose between life imprisonment without parole and death, and that any verdict had to be unanimous. The concluding sentence of the modified instruction read: "In order to make a determination as to penalty, all twelve jurors must agree, *if you can.*"

At this point a juror asked: "If we can't, Judge, what happens?" The trial judge replied that he knew what would happen but could not elaborate upon it. Defense counsel requested the court to inquire of the jury whether it would be able to reach a verdict, and the inquiry was posited. One juror responded: "Not the way it is going." The foreman replied: "That is tough, yes." The court then asked the foreman: "Do you think if I allow you to continue to discuss the matter and for you to go over the instructions again with one another, that the possibility of making a decision is there?" The foreman replied: "I believe there is a possibility." Another juror added: "We did need more time." Finally, a different juror asked: "[W]ould this be an either/or situation? . . ."—to which the court replied: "It is not that. . . . If you can make that either/or decision. If you cannot, then I will discharge you."

Under the 1977 death penalty legislation (former § 190.4, subd. (b)), if a jury was unable to agree on penalty the court would impose a sentence of life without parole. Under the current death penalty law applicable here, if the jury is unable to agree on penalty the court must impanel a new jury; if the second jury becomes deadlocked, the court in its discretion may impanel

a third jury or impose a sentence of life imprisonment without parole. (§ 190.4, subd. (b).)[23]

 Defendant argues that the trial court's failure to "forthrightly" answer the juror's inquiry was error. He contends that the only "forthright" reply would have been an instruction in the full-blown language of section 190.4, subdivision (b); i.e., informing the jury of the statutorily mandated procedures and possibility of subsequent retrials in the event of a deadlock.

We conclude that such an instruction under the 1978 death penalty law would have the potential for unduly confusing and misguiding the jury in their proper role and function in the penalty determination process. Penalty phase juries are presently instructed that their proper task is to decide between a sentence of death and life without the possibility of parole. Any further instruction along the lines suggested herein could well serve to lessen or diminish that obligation in the jurors' eyes. (See *People* v. *Kimble* (1988) 44 Cal.3d 480, 511-516 [244 Cal.Rptr. 148, 749 P.2d 803] [1977 death penalty law]; cf. *People* v. *Gainer* (1977) 19 Cal.3d 835, 852 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73] [wherein we held erroneous any instruction which states or implies that a jury's failure to reach a verdict will necessarily require retrial].)[24]

In any case, the trial judge here responded to the jurors' questions in a commendably forthright fashion. When initially faced with the inquiries, he sought to avoid any confusion or unseen prejudice by rereading the pertinent CALJIC instruction. But thereafter, when one juror asked the very pointed question: "Is it either/or?" [i.e., automatic imposition of one or the other penalty in the event of a deadlock]—the court prudently avoided misinforming and misleading the jury by stating: "If you can make that either/or decision. If you cannot, then I will discharge you." Defendant can claim no prejudice from such a limited disclosure. It bore no resemblance to the often criticized "*Allen*-type instruction" designed to extract a verdict from a deadlocked jury by admonishing the minority jurors to rethink their positions in light of the majority's views. (*Allen* v. *United States* (1896) 164 U.S. 492, 501 [41 L.Ed. 528, 530-531, 17 S.Ct. 154].)

The jurors deliberated an additional one and a half days after receiving reinstruction and the court's responses to their inquiries before reaching

---

[23] Of course the People may elect to forego a second or third penalty phase retrial and assent to imposition of a sentence of life imprisonment without the possibility of parole.

[24] Defendant speculates that without such instruction, a juror may believe that deadlock at the penalty phase will nullify the guilty verdicts returned in the guilt phase. However, in light of the instructions which explain the bifurcated nature of capital trials and the jury's function at the penalty phase, the possibility of such a mistaken inference being drawn is unlikely.

their penalty verdict. There was no objection to the rereading of CALJIC No. 8.84.2, nor did trial counsel propose or request any further instructions. No further instructions were required; no prejudice from the court's replies to the jurors' inquiries is shown.

### 12. *Automatic Motion for Modification of the Death Verdict*

In every case in which a death penalty is returned, the judge must "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reason for his findings." (§ 190.4, subd. (e).)

Defendant urges three grounds of error in the court's ruling on the automatic motion for modification of sentence. First, he contends that the content of a letter which the trial judge sent to the jurors—after they were discharged but prior to the hearing on the motion—reveals that the court had prejudged the merits of the motion, and could not thereafter render a fair and impartial decision. Second, he argues that the court's "verbatim" adoption of the proposed findings of fact and conclusions of law prepared by the prosecutor reflects a failure to exercise independent judgment in ruling on the motion. Finally, he contends the court improperly found lack of remorse as an aggravating factor in its findings on the motion.

### a. The Letter

Several days after the jury returned its penalty verdict and was discharged, the trial judge sent the 12 jurors and 4 alternates a letter in which he praised the manner in which they had approached their task and obligations. He indicated his feeling that they were "a credit to the criminal justice system," and explained: "It was extremely difficult for me to express these thoughts to you upon your discharge. It was an emotional moment; we had spent many hours together and I now feel I must express my gratitude to you." He added: "*Your decision is acceptable and shall be followed* (italics added)." It is this passage which, defendant urges, reveals that the court had prejudged the merits of the automatic motion for modification of his death sentence.

At the hearing on the motion, defense counsel expressed concern "that what was said in that letter would indicate in any way that the Court had made a decision prior to fully reviewing and hearing everything that was going to be said." The court responded: "Thank you. The statement, [']your

decision is acceptable and shall be followed,['] is not indicative of the Court having made up its mind nor is it a statement that would forebear any statements, evidence, testimony that would be offered on behalf of Mr. Belmontes. [¶] *I think the statement was made for therapeutic purpose more than a legal purpose* (italics added)." Counsel did not request the trial judge to recuse himself from hearing the motion. At the conclusion of the hearing the court reaffirmed that it had made an "independent finding" in affirming the jury's verdict of death.

Subsequent to a jury's discharge, it is not improper to thank or praise the jurors for having dutifully served on the jury and conscientiously performed their functions. In a long and complex capital trial such as this was, it is understandable that the court might want to express gratitude to the jurors along these lines. The trial judge's communication to the jurors by letter here was plainly intended to convey such sentiment.

However, at the time the court sent the letter, it had not yet fully performed its own functions and obligations under the mandate of section 190.4, subdivision (e). Judgment and sentence had yet to be imposed. The court's remark in the letter: "Your decision is acceptable and shall be followed," was patently improper. The court must refrain from making any comment indicating that it cannot, or will not, perform its remaining obligations fairly and impartially under the law. Since the jury had performed its functions and properly been discharged, our concern here is not with the fact that the communication was made to the jurors, but with whether the remark establishes an inference that the court *in fact* had prejudged the merits of the motion, and therefore could not fairly and impartially perform its statutory obligations in ruling thereon.

"It is presumed that official duty has been regularly performed." (Evid. Code, § 664.) ■■■ " '[I]n the absence of any contrary evidence, we are entitled to presume that the trial court . . . properly followed established law.' [Citation]." (*Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 913 [141 Cal.Rptr. 133, 569 P.2d 727].) ■■■ Considering the improper remark in the context of the letter in which it was made, together with the court's credible explanation that it "was made for therapeutic purpose more than a legal purpose," we conclude defendant has not established that the trial judge ultimately failed to make the "independent determination" respecting the appropriateness of the penalty verdict, as he was obliged to do under section 190.4, subdivision (e). The court's thorough and detailed findings entered in the record reinforce our conclusion.

b. The Findings

■■■ Prior to the hearing on the automatic motion, the prosecutor requested permission to submit proposed findings of fact and conclusions of

law in opposition to modification of the death sentence. Defense counsel stated: "I have no problem with it," but requested that he too be permitted to do the same. The prosecutor thereafter filed lengthy and detailed proposed findings of facts and conclusions of law. Defense counsel elected to file points and authorities in support of automatic modification of the death sentence. We find nothing improper in affording both defendant and the People the opportunity to file respective supporting and opposition memoranda in connection with the proceeding. Thoughtfully prepared documents of this type are of great assistance to a trial judge.

It is clear from the record that the court relied extensively on the prosecutor's proposed written findings, incorporating whole portions of them almost verbatim into its own findings in the record. The record likewise reflects that the court did not "rubber stamp" the prosecutor's proposed findings of fact, refusing to subscribe to many of his overly conclusory proposals.

For example, the prosecutor proposed that the court adopt the following findings: "The defendant, while waiting in the victim's home and while talking to her, considered the alternatives available and decided to go through with the burglary, even though the victim was at home. By disabling the victim, he reasoned, the burglary could be completed unimpeded and by killing her, he decided, he would avoid identification as the perpetrator. The defendant knew from his conversations with Vasquez and the victim, that only Vasquez would be suspected. He knew that no one had seen him arrive at the home. He also knew he could hide out in Stockton or Southern California. Therefore, he concluded, the death of Steacy McConnell would eliminate the only person who could link him to the crime, except for his partners in the criminal enterprise, whom he counted on to maintain silence." These proposed "findings of fact" were riddled with *conclusory* inferences of defendant's state of mind; the court quite properly rejected them.

The prosecutor proposed a finding that, upon alighting from the Chevy, Bolanos and Vasquez "were able to hear the beating taking place inside." Although such was a fair inference to be drawn from the evidence, the court took pains to more accurately paraphrase the trial testimony, finding: "As they were outside they were able to hear the sound of thumping taking place inside, according to Ballanos' [*sic*] testimony." The prosecutor also proposed that the court make a finding that after the crime, while in the car, "[defendant] then stated that he had killed her to silence a witness." The court more accurately found that: "He then stated he had to take out a witness."

Our review of the court's detailed findings in the record convinces us that it fulfilled its statutory obligation to independently review the jury's verdict of death.

### c. Lack of Remorse

Defendant argues that the court improperly made a finding that his lack of remorse was an aggravating factor. The prosecutor proposed that the court find: "[T]he defendant expressed no remorse of even the slightest degree pretrial, in his guilt phase testimony, in his penalty phase testimony, nor during his closing remarks to the jury at the penalty phase." The court instead made a finding that: "The defendant did not express any remorse in the guilt phase of his testimony. In his penalty phase, however, he did indicate to some slight degree his concern for the victim." This finding was included in that portion of the overall findings discussing mitigating circumstances. For reasons already explained, we find that both the prosector, in his argument to the jury, and the trial court, in its own findings on the automatic motion for modification of sentence, did no more than suggest the *inapplicability* or insubstantial evidence of remorse as a *mitigating* factor. (*People* v. *Rodriguez, supra,* 42 Cal.3d at p. 790.)

### 13. *Proportionality Review*

Defendant urges that we conduct "intercase" proportionality review—i.e., an examination of whether imposition of the death penalty in his case is disproportionate to the penalties imposed on other persons who have committed similar offenses. It is settled that the Eighth Amendment requires no such comparison. (*Pulley* v. *Harris, supra,* 465 U.S. at pp. 51-54 [79 L.Ed.2d at pp. 41-43].)

Defendant urges that principles of *equal protection* require that he—as a capitally sentenced defendant—be afforded comparative sentence review equivalent to that provided for determinately sentenced felons under the "disparate sentence" statute. (§ 1170, subd. (f).) We have recently rejected the identical argument in *People* v. *Allen, supra,* 42 Cal.3d at pages 1286-1287.

Defendant argues that state and federal proscriptions against "cruel and unusual punishment" require that we conduct "intracase" proportionality review—i.e., an examination of whether defendant's death sentence is proportionate to his *individual* culpability, irrespective of the punishment imposed on others. (E.g., *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-482 [194 Cal.Rptr. 390, 668 P.2d 697]; *People* v. *Lynch* (1972) 8 Cal.3d 410, 423-424 [105 Cal.Rptr. 217, 503 P.2d 921].)

Defendant was convicted on extremely strong evidence that he committed an intentional murder of extraordinary brutality. He bludgeoned McConnell to death with an iron dumbbell bar; the force of the 15 to 20 some-odd blows leaving her with gaping wounds and a cracked skull. Her defensive wounds plainly evidenced a desperate struggle for life at defendant's hands. The murder occurred in the course of a calculated plan to burglarize the victim's home, to which defendant had gained entry on false pretenses. After the murder, defendant and his accomplices callously fenced the victim's stereo components for $100—purchasing beer with a portion of the proceeds.

In the penalty phase the jury was fully apprised of all the factors properly bearing upon whether defendant was eligible for, and deserved, the death penalty. There was, of course, defendant's relative youth, evidence that he had a difficult childhood, and evidence that prior to the murder he had to some degree embraced religion and impressed others with his sincerity in this regard. However, "nothing in prior decisions of this court, or of the federal courts, suggests that his punishment is constitutionally disproportionate to 'the offense' or 'the offender.'" (*People* v. *Melton, supra,* 44 Cal.3d at p. 771.)

### III. CONCLUSION

We find no prejudicial error, whether viewed singly or cumulatively, at either the guilt or penalty phases of defendant's trial.

The judgment is affirmed.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Arguelles, J., and Kaufman, J., concurred.

Appellant's petition for a rehearing was denied August 18, 1988, and the opinion was modified to read as printed above.